IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 114,312

STATE OF KANSAS,
*Appellee*,

v.

CHRISTOPHER LYMAN,
*Appellant*.

SYLLABUS BY THE COURT

1.

To establish the right to a new trial based on newly discovered evidence, a criminal defendant must show: (1) that the newly proffered evidence could not have been produced at trial with reasonable diligence; and (2) that it is of such materiality that it would be likely to produce a different result upon retrial.

2.

Three essential elements must exist in a claim alleging violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963): (1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) it must be material so as to establish prejudice.

3.

Under K.S.A. 2018 Supp. 60-456(b), a district court has a gatekeeping obligation to ensure the reliability and relevancy of proposed expert testimony. In performing its gatekeeping function, a district court may consider the nonexclusive factors set out in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L.

Ed. 2d 469 (1993). The reliability inquiry must be tied to the particular facts and circumstances of the particular case.

4.

Under K.S.A. 2018 Supp. 60-456(b), the district court must have considerable leeway in deciding in a particular case how to determine whether expert testimony is reliable. The court should consider the specific factors identified in *Daubert* where they are reasonable measures of reliability. Whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the district court broad latitude to determine.

5.

Under the facts of this case, evidence documenting prior assault of a child sufficient to visibly distress him and leave bruises on his face constitutes other crime evidence under K.S.A. 2018 Supp. 60-455. Such evidence is so similar to the medical observations and conclusions at issue that it is reasonable to conclude the same individual committed both the prior acts and those claimed in this case. It is relevant to show the defendant's modus operandi, a disputed material fact, and is probative because it contradicts the defendant's claim that previous health issues and not the defendant caused the child's death. And the district court did not abuse its discretion in finding the probative value of this evidence outweighed its prejudicial effect.

6.

In requesting recusal of a trial judge under K.S.A. 20-311d(b), the language of the statute and Kansas caselaw make plain that under the circumstances of this case an affidavit is required for the chief judge to review. An affidavit is a written statement, under oath, sworn to or affirmed by the person making it before some person who has authority to administer an oath or affirmation.

2

7.

The party alleging judicial misconduct bears the burden of establishing that it occurred and that it prejudiced the party's substantial rights. Under the circumstances of this case, a motion for change of judge for posttrial matters based on an allegation in a letter from one trial spectator that the judge appeared to be sleeping during the trial was not sufficient to meet this burden.

8.

An abuse of discretion standard applies to the district court's ruling on enforceability of a stipulation. Under the circumstances of this case, the court did not abuse its discretion in declining to enforce a stipulation regarding waiver of hearsay and foundation objections to medical records used to form the basis of a proposed expert's opinion where the court held the defendant's proposed expert was excluded from testifying.

9.

In the absence of any trial error, none can accumulate; and the presence of one error is insufficient to accumulate.

Appeal from Geary District Court; STEVEN L. HORNBAKER, judge. Opinion filed January 10, 2020. Affirmed.

*Richard Ney*, of Ney and Adams, of Wichita, argued the cause, and *Roger L. Falk*, of Joseph, Hollander & Craft, L.L.C., of Wichita, was on the briefs for appellant.

*Jason B. Oxford*, assistant county attorney, argued the cause, and *Thomas A. Hostetler*, assistant county attorney, and *Derek Schmidt*, attorney general, were on the briefs for appellee.

The opinion of the court was delivered by

3

NUSS, C.J.: Christopher Lyman asks this court to reverse his convictions for felony murder based on abuse of a child, abuse of a child by shaking, and aggravated battery. The victim was Lyman's eight-month-old nephew J.S. who was temporarily living with Lyman, his wife Tammarisk, and their son, E.L.

After Lyman filed his direct appeal, the prosecutor asserted that he thought he saw a family matching the general appearance of Lyman, Tammarisk, E.L., and J.S. in a store two days before J.S.'s death. The woman acted aggressively toward the older child and the other child did not look well. After this court remanded for a hearing on this newly discovered evidence, the district court ultimately concluded it was not corroborated and too speculative to warrant a new trial.

The issues on appeal, and this court's accompanying holdings, are as follows:

1. Did the district court err by denying Lyman's motion for new trial? No.

2. Did the district court abuse its discretion in excluding Lyman's proposed expert witness for failure to satisfy the test under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)? No.

3. Did the district court err by allowing the State to introduce evidence of Lyman's prior bad acts? No.

4. Did the district court judge commit judicial misconduct by sleeping during the trial? No.

5. Did the district court err by prohibiting Lyman from introducing medical records that were subject to a written stipulation? No.

4

6.      Did cumulative errors require reversal and remand for a new trial? No.

As a result, we affirm Lyman's convictions.

FACTS AND PROCEDURAL BACKGROUND

*Evidence at Trial*

The district court held a two-week jury trial beginning in May 2015. What follows is a summary of the evidence most relevant to this appeal.

Police Officer David Sloan testified he responded to a call from Geary County Hospital (GCH) for suspicion of child abuse on September 15, 2013. There he met with the emergency room's Dr. Graham Keats and pediatrician Dr. Adikuor Adjetey. They told him J.S. was dying and had bruising on his face, subarachnoid bruises, and asymmetric pupils. Sloan briefly observed J.S. while being prepared for transport to Children's Mercy Hospital in Kansas City.

Sloan then met with Lyman and his one-and-a-half-year-old son E.L. in the lobby. Lyman told him the family had been caring for J.S. since August 28—about two weeks prior—while J.S.'s mother put her life back together. Sloan asked Lyman what had happened to J.S. that night. Lyman replied that E.L., who slept in his own room, woke up Lyman. He checked on E.L. and then on J.S. in another room. J.S. was "lifeless, cold, unresponsive, although the child still was breathing, still had a pulse." Lyman woke up his wife and the four of them came to the emergency room. Lyman thought the bruises might have happened when J.S. was playing with E.L. because sometimes the boys collided. Also, about two weeks earlier, Lyman had been carrying J.S. when he fell down

5

some stairs. But Lyman said he took the brunt of the fall with his own back and did not think that J.S. was injured.

Dr. Keats testified he was working the night shift and was the first doctor to see J.S. The child was pale, unresponsive, having difficulty breathing, and did not respond to stimuli. When Dr. Keats shone a light in J.S.'s eyes, his right pupil reacted but the left did not, indicating a brain injury or problem with oxygen to the brain. Dr. Keats started an IV, further examined J.S., and ordered lab work and a CT scan.

Dr. Keats also observed bruising on J.S.'s right cheek. He initially considered SIDS and child abuse as possible causes of J.S.'s condition. SIDS, however, would not cause a subarachnoid hemorrhage, so he had to consider whether there was a history of injury to cause the brain bleed. He explained the arachnoid membrane is the layer of tissue next to the brain, and subarachnoid means the bleeding is next to the brain itself. The CT showed a questionable trace of subarachnoid blood in the right temporal region, which led him to suspect some injury to J.S.'s head. That type of injury led Dr. Keats, in consultation with Dr. Adjetey, to consider child abuse as a cause of J.S.'s injury and to contact the Geary County police.

Dr. Keats also spoke to Lyman outside J.S.'s room. Dr. Keats asked what had happened at home that led Lyman to bring the child in, how had he found the child, and whether there was any history of previous illnesses with J.S. Lyman told him he had gotten up for another reason, gone in to check on J.S., found him unresponsive and brought him to the emergency room. He did not know of any falls within the last few days. Dr. Keats found Lyman pleasant and easy to talk to but unemotional and not worried about J.S. Lyman also told Dr. Keats that J.S. had a history of respiratory syncytial virus (RSV), a breathing disorder. But Keats did not observe any residual issues from the RSV in J.S.'s chest.

6

Using a laryngoscope that goes over the tongue, Dr. Keats had tried to place a plastic tube in J.S.'s airway to assist his breathing, a process known as intubation. The procedure was difficult, however, because of some swelling in J.S.'s pharynx and around the area above his airway. He and Dr. Adjetey both attempted to intubate J.S. before calling in a Certified Registered Nurse Anesthetist (CRNA) who successfully completed the procedure. Dr. Keats explained the intubations occurred very quickly one right after the other, and upon examining the inside of J.S.'s mouth, he did not think it was damaged by them.

Because CRNAs routinely do intubations for their work, to his knowledge the procedure would not have injured J.S.'s gums or frenulum—an area between the lip and upper teeth. J.S.'s temperature was taken rectally, but this procedure would not be expected to cause injury to his anus. J.S.'s rectal temperature was 91.8 degrees, much lower than the typical 98.6.

Dr. Keats testified that when J.S. came to GCH, he was critically ill, i.e., there was a good chance he could die. J.S.'s condition was the same when he was transported to Children's Mercy.

Dr. Adjetey testified she was on call for GCH that morning. She arrived at the hospital by 3:30 a.m. and found Dr. Keats in the resuscitation room attempting to intubate J.S. Dr. Adjetey then tried once before the CRNA succeeded. She observed that J.S. was unresponsive with a bruise on his forehead and on his right cheek. His left eye was asymmetrical, meaning the pupil was dilated and would not respond to light.

Dr. Adjetey ordered a CT scan. From it the radiologist determined there was a diffuse injury to J.S.'s brain and blood on its right side. Dr. Adjetey recommended J.S. be transferred to Children's Mercy to their pediatric intensive care unit. She was concerned that J.S. had a brain bleed, was only eight months old, and for a child of that age to

7

sustain such an injury there must have been some kind of tremendous force to the head. She further testified that because an eight-month-old child is usually not walking, most injuries would be low impact. Dr. Adjetey conferred with Dr. Keats, and they contacted law enforcement to report possible abuse.

Dr. Adjetey also took a medical history from Lyman. He told her that J.S. had not been acting like himself the last few days but that day he was eating well and acting normally. He put J.S. to bed at about 7 p.m. and checked on him at 10 p.m. At 2:30 a.m., E.L. woke up Lyman. After checking on E.L., Lyman checked on J.S. and found him unresponsive and limp in his bed.

Children's Mercy child abuse pediatrician Dr. Terra Frazier testified she examined J.S. in the pediatric intensive care unit. Numerous tests were done, including CT scans of J.S.'s head, blood tests, tests to detect infection, and an EKG. The CT scan showed subdural blood (outside of the brain but inside of the skull), on the right side and in the interhemispheric area (the space between the two halves of the brain). J.S. also had "mass effect," i.e., the blood was squishing his brain, and he had loss of gray/white matter or diffuse cerebral edema. She further testified these types of injuries require a significant amount of force. An eight-month-old's normal daily activities and care should not cause injuries of this magnitude.

Dr. Frazier took photographs of bruises on J.S.'s right eye, inside of his left ear, right ear, hip and groin area, chest, left side of the top of his head, right back side of his head, front of his head, and left buttocks. J.S. also had red scabbing on the back of his head.

J.S. had a rectal thermometer—a very small, thin, flexible tube of soft rubber—inserted to keep track of his body temperature. It is inserted with a lubricant and not expected to cause damage. In one photograph, Dr. Frazier had moved the thermometer

8

aside to show perianal lacerations—tears around the skin of the anus—and bruising on the right buttock. Dr. Frazier testified the lacerations would not be consistent with stooling, defecating, or wiping for cleansing because of their location and nature. She diagnosed the lacerations as blunt, external force penetrating trauma.

Dr. Frazier testified she took a photograph of J.S.'s mouth showing injury to the lower lip and gums. According to her, the injury was not consistent with intubation because of its location near the lower lip, which would not be contacted by the instrument during the procedure. While there was also injury to the frenulum it also would not be associated with intubation.

She further testified that children who are mobile could be expected to have bruising on the forehead, forearms, and shins—i.e., areas that are particularly affected when children fall. But injuries to the ears, chest, and mouth would not be expected in such children and even less so in those with limited mobility. According to the doctor, these types of injuries could not be explained by RSV, rubella, or diabetes.

Dr. Frazier further explained it is possible to have a brain injury without external marking when the brain is moving about or experiencing different forces within the skull, such as acceleration/deceleration type injuries. A force above and beyond routine care and handling would cause such an injury, such as severe motor vehicle collisions—or child abuse (including shaking, impact, and penetrating wounds). She testified that when the brain swells and herniates, it affects the ability to regulate breathing.

Dr. Frazier also testified J.S. had multilayered retinal hemorrhages that were too many to count. They extended out to the periphery—which is associated with abusive head trauma and consistent with shaking. As a result of examining J.S., his medical history, laboratory studies, radiologic studies, and the rest of the information available to her at the time, and based on her expertise and training, Dr. Frazier diagnosed J.S. with

9

physical abuse and abusive head trauma. Given his level of brain injury, she expected that he would have reacted in a different manner immediately after its cause. According to her, any caregiver should have been able to look at him and tell something was wrong.

Lisa Lowe, pediatric radiologist at Children's Mercy, testified she looked at the CT images without any patient history information. She found acute subdural hematoma on the right side of the brain, i.e., blood surrounding it. While there was not much hemorrhaging, the entire brain was swollen. Because this could be a risk for sudden death, she contacted the intensive care unit to alert them and advise that the bleeding associated with the diffuse brain swelling was most likely caused by child abuse or nonaccidental trauma.

Dr. Lowe never saw J.S. or any other medical history. But the type of injury alone caused her concern. According to the doctor, the very generous window for the injury to have occurred was six hours to seven days. But she testified a child with that type of injury would be unresponsive, limp, and unable to do anything other than breathe and have a pulse. In sum, there was no way a child with these injuries could be walking around his home looking normal and doing normal child activities.

Forensic pathologist Erik Mitchell testified he performed an autopsy on J.S. on September 19. He too testified the lip injury was not from intubation. He further testified to finding, among other things, a bruise on J.S.'s right upper eyelid and bruises at the cheek level; a discoloration on the forehead between the eyebrow and the hairline; a healing injury on the back of the skull; bruises on the scalp; and a subdural hematoma which he opined indicated a head trauma.

He concluded these findings showed a pattern of injury going from front to back. Moreover, there was nothing "that would be inconsistent with multiple applications of the force of a hand."

Dr. Mitchell noted the presence of the "classic triad" associated with shaking death: retinal hemorrhages, hemorrhages about the optic nerve sheaths, and subdural hematoma. He concluded J.S.'s death was not caused by a blood disorder, RSV, or accident but by injuries.

In addition to the evidence from the State's medical witnesses, Sergeant Detective Cory Odell testified. He spoke to Dr. Keats who reported Lyman seemed disinterested in what was going on the night he brought in J.S. And Lyman left the hospital soon after bringing in J.S.

William Arnold Jr., police detective and certified forensic computer examiner who specializes in cybercrime, testified about photos on Lyman's phone and computer searches Lyman completed in the weeks before J.S.'s death. Arnold testified a photo of J.S. on Lyman's phone was taken on July 25, at 11:11 a.m.—about seven weeks before the boy's death. And one more selfie photo of Lyman with J.S. was taken less than 60 seconds later.

In two other photographs taken within the same 60-second timeframe, Lyman is pressing down on J.S.'s eyelids. About 30 minutes later another photograph was taken of J.S. with a pacifier saying "bad seed." Arnold testified this later photograph contained marks near J.S.'s right eye and on his forehead that appeared to be bruising.

Additionally, photographs on Lyman's phone taken on September 2 (about two weeks before J.S.'s death) showed bruising on J.S.'s forehead and near his eye as well as a hand covering his face. Arnold pointed out a photo of J.S. appearing alert and normal on Saturday, September 14 at 4:02 p.m.—but he was then taken to the hospital that night and eventually died.

11

Arnold also testified he found a message on Tammarisk's phone from J.S.'s mother, M.S., on July 25 at 3:51 p.m. He also found a text message to "Ice Mom," later identified as Tammarisk's and M.S.'s mother—T.S.—17 minutes later. Later testimony revealed that M.S. frequently used her mother's phone, and therefore the message was probably from Tammarisk for M.S. It stated:

"Can't talk right now. I have asked everyone. No he wasn't dropped. He has been sick since he was fed peach[es] and cereal. That's why he had a bath. Also he had been really tired lately. Calia, grandma, Chris and Jean can attest to that. *But it will be best if he is watched by other people. Since I feel you think he is abused over here. That is the last thing that happens. Yes bruises around his waist are from Chris* [Lyman] *having no real feeling in his fingers. Sorry that you feel he isn't cared for here*. The worst thing that might happen is [E.L. tries] to play a little [rough]. But he is told no right away." (Emphasis added.)

Also entered into evidence was a text exchange Arnold found between Tammarisk and Lyman. Tammarisk texted, "[E.L.] was crabby for a few hours. Now he is just being a little bratty. [J.S.] is starting to stir, so I am going to go up and get him in a bit." On September 12—three days before J.S.'s final trip to the hospital—Lyman responded, "Leave [J.S.] to his own demise."

Finally, Arnold testified he found a search on Lyman's phone dated August 25—three weeks before J.S.'s death—for "effects of shaken baby syndrome."

Richard Marchewka, forensic scientist from the Kansas Bureau of Investigation, also testified. On August 31 (two weeks before J.S.'s death) Lyman's computer history showed that the user, presumably Lyman, had visited a Children's National Health System webpage on concussion as well as frequently asked questions discussing brain trauma and concussion. According to Marchewka, two minutes later the computer showed a visit to a Mayo Clinic webpage discussing concussion and symptoms of

concussion. The next day the user accessed a website on abusive head trauma, shaken baby syndrome, and an explanation of injuries to the head from that syndrome.

Kacy Drake testified she babysat both J.S. and E.L. on Friday, September 13, the night before J.S. was taken to GCH. The Lymans dropped the boys off at her apartment around 5:30 p.m. Her children were also there. J.S. was fussy that evening, cutting a few top teeth. According to Drake, she therefore held J.S. almost the whole time. The Lymans picked the boys up by 8 p.m. She did not notice J.S. fall, get hit, or bump anything. He had no conflict with her children, and she herself did not hit or harm him. She did not notice anything unusual about him that evening.

J.S.'s mother, M.S., testified she and J.S. lived with her grandmother in Ohio. When J.S. was four months old, she started working in Chardon, Ohio. M.S. arranged for her sister Tammarisk, and brother-in-law Lyman, who at the time lived 20 minutes outside Chardon, to watch J.S. while she worked. Six days a week she would get J.S. ready, put him in the car seat, drive to the Lymans' house, drop him off, work, and then pick him up around 5 or 6 p.m.

On July 25, M.S. "very angrily" contacted Tammarisk after she noticed small bruising around J.S.'s waist, a bruise on his head, and unusual behavior. They talked by phone, and she could hear Lyman in the background, explaining that he might have tripped over J.S. in the car seat in the dark. According to M.S., she would leave J.S. in the car seat inside the Lyman front door while the family was sleeping and someone would come and get J.S.

The Lymans stopped watching J.S. as they packed for their move to Kansas in August. When M.S. got into legal trouble for driving under the influence and could not afford the court payments, Tammarisk agreed to take J.S. for a couple of weeks so M.S.

13

could catch up financially. M.S. did not talk to Lyman about this arrangement. After two weeks, M.S. still did not have the money to retrieve J.S.

M.S. testified J.S. had a long history of visits to the doctor, beginning even before he was born. She was in a major car accident when she was six-and-a-half months pregnant. She had to take antibiotics for an infection before she could go into labor. M.S. also indicated J.S. had problems with his heart.

When J.S. was born, he was gray and the umbilical cord was around his neck. He defecated during the birth, threatening an infection. He was placed in an incubator the first night and M.S. was sent home three days after the birth. She also testified J.S. had genetic rubella.

When J.S. was a month-and-a-half old, he stopped breathing. M.S. rushed him to the emergency room across the street, and they resuscitated him. J.S. had whooping cough. J.S. also stopped breathing when he was three months old. M.S. again rushed him to the emergency room and they both rode in an ambulance to the children's hospital. He was there for a week—part of the time on full life support. He was diagnosed with RSV and sent home with a breathing machine.

Regarding J.S.'s relationship with the Lymans, M.S. testified that J.S. was very close to them. She herself is close with her sister Tammarisk, and they talk every day. M.S. testified "Dad" was the only word J.S. ever knew and he used it to refer to Lyman. According to M.S., J.S. would chew on his bottom lip as he was teething to the point of bleeding.

According to the police, they found two sex toys in a drawer in the Lyman master bedroom's vanity, one of which was silicone and the other glass. They obtained DNA swabs from Lyman to compare to DNA found on the sex toys. On the silicone toy, both

the plastic handle end and the silicone one had a DNA profile consistent with his known DNA profile.

For the silicone end, the DNA profiles of at least three people were in the mixture. Additional testing using the Y-chromosome identified that genetic material as consistent with the known male DNA haplotype of J.S. The probability of selecting an unrelated male at random from the general population with that partial male DNA haplotype is approximately one in every 8,621 individuals.

The glass sex toy contained a profile consistent with Lyman's of one in 57 trillion. Its other end had a male DNA haplotype consistent with a mixture from at least two individuals that could be separated into a major and minor haplotype. The major was consistent with Lyman, so he and all his male paternal relatives could not be excluded as possible contributors. The minor profile was consistent with J.S., so he and all of his male paternal relatives could not be excluded as possible contributors.

Lyman did not testify. But the State played for the jury the video tape of his police interview from Sunday, September 15. At one point when he was alone in the interview room he got up and said, "My life is over."

For the defense, Dean Stetler, associate professor in molecular biosciences at the University of Kansas, testified there could have been cross contamination in performing the DNA analysis on the sex toys because the playpen crib pad was processed alongside them. He also said there could have been cross-contamination of DNA on those toys while they were in the drawer, but he did not see any toys or children's items in the picture of the drawer contents.

Jessica Lyman, Lyman's sister, testified she has a son the same age as J.S. The Lymans sometimes babysat her son but he never came home with any bruises. She

testified Lyman was a loving father to J.S. And she described J.S. as a child with gray coloring who was fussy, vomited frequently, and breathed differently.

T.S. (J.S.'s grandmother) testified she had observed the bruises on J.S.'s waist from July which Tammarisk had explained were caused by Lyman gripping J.S. too tightly because Lyman does not have feeling in his fingers. She also testified J.S. was often fussy, especially at night, and that he would "posture" or bunch up and scream and turn red.

The defense also called M.S. back to the stand to testify that J.S. postured, causing him to arch his back and turn red.

Missing from the trial was evidence from the defense's proposed expert Dr. Thomas Young. The State had filed a motion in limine requesting he be excluded from testifying. After an evidentiary hearing on the motion, the district court excluded his testimony—holding Young's methods did not meet the requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

The jury convicted Lyman of felony murder based on abuse of a child, abuse of a child by shaking, and aggravated battery. But it acquitted him of aggravated sodomy.

Lyman later filed a motion for a new trial. It also requested a change of judge for the remainder of the posttrial matters, alleging he had been sleeping during the trial. Both requests were denied. The judge imposed a life sentence for felony murder, 41 months for aggravated battery, and 32 months for abuse of a child, with both lesser sentences to run concurrent with the life sentence.

More facts will be added as necessary to the analysis.

ANALYSIS

Issue 1: *Did the district court err by denying Lyman's motion for new trial?*

Lyman argues the district court (1) abused its discretion in denying his motion for a new trial based on newly discovered evidence concerning the prosecutor, Chris Biggs; and (2) erred in denying it because the State failed to disclose this exculpatory evidence when it came to light before trial in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

*Hearing on the Biggs affidavit*

While Lyman's appeal was pending in our court, the State served his counsel with a disclosure of "potential exculpatory evidence" by Biggs, who prosecuted the case. In short, Biggs, who has had memory issues as a result of illness, believed he might have seen the family at a Wal-Mart two days before J.S.'s death, and he felt compelled to disclose this fact in case it might lead to exculpatory evidence. This court remanded for a hearing.

The same judge who had presided over the jury trial—Judge Steven L. Hornbaker—held a hearing on the newly discovered evidence. There, Biggs confirmed that he had checked the date he filled the prescription at Wal-Mart and the date of his debit card records to confirm he was at the Wal-Mart on Friday, September 13, 2013. He testified that he was not yet working for the county attorney's office at that time. But, in preparing for the trial, he felt that there was something on the tip of his tongue about a connection between the Wal-Mart incident and the Lyman case.

Biggs testified it was possibly not even the night of September 13 that he saw a woman yank a child by the arm. He remembered being at the pharmacy and purchasing patches and pieced the rest together from phone, debit card, and pharmacy records. Solely from these records, he determined that was the only day he was at the Wal-Mart pharmacy in September 2013. But as he stated in the affidavit, Biggs testified his memory could not tell him what year, much less the exact day.

Biggs also could not testify with certainty that it was the Lymans whom he saw, only that that the general race, physical stature, and the ages of the children would have been consistent. According to him, the incident was "just a matter of seconds." When it was over, he was satisfied that whatever abuse was going on stopped and went on about his shopping. Biggs thought he might have had a conversation with Steven Opat—his supervisor at the time of trial—about his memories. But he did not recall what he told Opat.

Opat testified he was the county attorney from 2003 through January 9, 2017, and Biggs was his deputy starting around June 2014. He recalled having several conversations daily with Biggs about the Lyman cases—both Lyman's and Tammarisk's criminal and child in need of care cases (for E.L.). But he did not remember any conversation about a conflict or exculpatory evidence.

Detective Odell testified he never had any conversations with Biggs regarding his memory of possibly seeing a woman snatch up a child by the arm at Wal-Mart. He did prepare a probable cause arrest affidavit with a timeline of the case. There, he reported one subject had informed him the family went to Wal-Mart on the morning of Saturday, September 14, 2013—not Friday, September 13, when Biggs was there. The timeline reflected this and showed that the adults dropped the boys off at the babysitter's Friday night—September 13—before going to a store. But it did not identify which store.

18

*Ruling denying the motion for new trial*

The district court held that the Biggs evidence could not have been discovered through the exercise of due diligence by defense counsel. But the court also held the evidence was neither relevant nor credible. The court relied heavily on the total absence of corroborating evidence showing the family was at Wal-Mart on Friday, September 13.

The court reviewed the evidence, including the hearing testimony and Lyman's taped police interview. It specifically observed Lyman said during that interview of Sunday, September 15, that he picked the boys up from the sitter and went straight home on Friday, September 13. And no one testified that the family was at Wal-Mart that night. The court concluded Biggs' testimony that he even saw the Lyman family was pure speculation.

And finally, the court found the evidence against Lyman was "substantial and damning." There was

> "evidence of his dislike for [J.S.], pictures of him abusing [J.S.] in the past and computer evidence that Lyman searched the internet seeking information on 'shaken baby' the week prior to the death of [J.S.]. The many other injuries to [J.S.] could not have been received in the way Lyman described according to the medical experts. Many of the statements of Christopher Lyman did not add up. He got up at one point when Detective [ODell] was not in the interview room and said, 'my life is over.' There is a plethora of the evidence upon which the jury could rely to convict Mr. Lyman. There is more than sufficient evidence to convict in this case and as a practical matter, Mr. Biggs's memories, even if admitted would not cause a different verdict because it is not credible."

Thus, the court concluded there was no reasonable probability that the evidence would produce a different result if a retrial was granted. So it denied Lyman's motion.

19

*A. Did the district court abuse its discretion in denying the motion for a new trial based on newly discovered evidence?*

Lyman specifically argues Biggs' statement was material because Lyman asserted his innocence, making the primary issues in the case "who, what, where & when, caused the injuries to [J.S.], which ultimately resulted in his death." As a result, he contends had this evidence been available at trial, it would have been consistent with his defense.

*Standard of review*

An appellate court reviews the district court's decision on a motion for new trial for an abuse of discretion. *State v. Williams*, 303 Kan. 585, 595, 363 P.3d 1101 (2016). "'"A district court abuses its discretion if its decision is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact."' *State v. Mattox*, 305 Kan. 1015, 1029-30, 390 P.3d 514 (2017)." *State v. Butler*, 307 Kan. 831, 852, 416 P.3d 116 (2018). Here, Lyman bears the burden of demonstrating such abuse. See *State v. Warren*, 302 Kan. 601, 614, 356 P.3d 396 (2015).

*K.S.A. 22-3501 and newly discovered evidence*

The right to a new trial for newly discovered evidence is set out in K.S.A. 2018 Supp. 22-3501(1):

> "The court on motion of a defendant may grant a new trial to the defendant if required in the interest of justice. If trial was by the court without a jury the court on motion of a defendant for a new trial may vacate the judgment if entered, take additional testimony and direct the entry of a new judgment. *A motion for a new trial based on the ground of newly discovered evidence may be made within two years after final judgment, but if an appeal is pending the court may grant the motion only on remand of the case.* A motion for a new trial based on any other grounds shall be made within 14 days after the verdict

or finding of guilty or within such further time as the court may fix during the 14-day period." (Emphasis added.)

To establish the right to a new trial on this basis, a criminal defendant must show: (1) that the newly proffered evidence could not have been produced at trial with reasonable diligence; and (2) that the newly discovered evidence is of such materiality that it would be likely to produce a different result upon retrial. *Warren*, 302 Kan. at 615. In determining whether new evidence is material, the trial judge must assess the credibility of the newly proffered evidence. The appellate court does not reassess the judge's credibility determination. 302 Kan. at 615-16.

*Discussion*

Lyman contends corroborating evidence exists for Biggs' statement. First, Lyman points to evidence that J.S. was fussy on Friday, September 13, which Lyman equates to pale in color and an indication that his injuries might have occurred prior to the night of Saturday, September 14, or the early morning hours of Sunday, September 15. Lyman also points to a reference in Detective ODell's probable cause affidavit that he and Tammarisk went to the store on Friday September 13. But the affidavit shows the Lymans dropped off the children at the babysitter's before they went to the store. Furthermore, the store is not identified.

Next, Lyman relies on the medical evidence from Mitchell and Frazier, and Lowe's opinion that the injury could have been caused anywhere from six hours to seven days before J.S. arrived at the hospital. Last, Lyman cites testimony from family members and his supervisor that he was a loving father, they had never seen him be violent or injure any child, and it would be out of character for him to intentionally injure J.S.

21

The State responds that the Biggs evidence is inadmissible because it is not relevant under K.S.A. 60-401(b). According to the State, there is no tendency in reason to prove any material fact because Biggs recalled too few details to even identify who he saw at the Wal-Mart. And, even if this evidence were relevant, it is not material enough to have changed the trial's result.

We need not thoroughly consider the first prong of the test for newly discovered evidence because we agree with the district court on the second. That is, the newly discovered evidence is not of such materiality that it would be likely to produce a different result upon retrial. *Warren*, 302 Kan. at 615. The district court specifically determined that Biggs' memories regarding an incident he witnessed at a Wal-Mart are so uncertain as to be unreliable. Biggs did not remember with any certainty the year that he may have witnessed the incident. And he cannot confirm with any certainty the identity of the family he observed.

There is no evidence in the record mentioning a Lyman family trip to Wal-Mart other than the probable cause affidavit, and it shows they went Saturday morning September 14. And testimony from the babysitter, Drake, reveals that J.S. was at her house on the evening of Friday, September 13. To reverse the district court under these circumstances would be an improper reassessment of the judge's credibility determination. See 302 Kan. at 615-16. Furthermore, the evidence against Lyman, especially the medical testimony, is overwhelming.

B. *Did the district court err by denying the motion for a new trial based on the State's failure to produce exculpatory evidence?*

Lyman alleges the State committed a *Brady* violation because Biggs did not come forward with this evidence before the trial. See *Brady v. Maryland*, 373 U.S. 83.

22

The State responds there can be no *Brady* violation because the so-called evidence does not tend to establish Lyman's innocence nor undermine any of the witnesses' reliability. Whether the nondisclosure was intentional (which the State denies) or inadvertent, the evidence was not material enough to establish prejudice.

*Standard of review*

Our standard of review is unlimited for the existence of a *Brady* violation with deference given to the district court's findings of fact. *State v. Warrior*, 294 Kan. 484, 510, 277 P.3d 1111 (2012).

*Discussion*

Lyman argues that if he had known of the exculpatory Biggs evidence, he would have been able to seek other avenues for his defense, such as implicating Tammarisk or challenging the timing of the injury.

Three components or essential elements must exist in a *Brady* violation claim: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be material so as to establish prejudice. 294 Kan. at 506.

As discussed above, the Biggs evidence fails to meet key elements of a *Brady* violation claim. The evidence is not credibly exculpatory or impeaching. Biggs' account of the Wal-Mart incident is too speculative and not corroborated by other evidence. Nor is it so material as to establish prejudice, given the large amount of contrary testimony, as the district court articulated. At trial Lyman did challenge the timing of J.S.'s injury, but

23

the overwhelming medical evidence shows that once the injury occurred, J.S. would not have been responsive. In other words, any earlier unwell pallor or sickness such as allegedly seen at Wal-Mart on Friday could not have caused the brain injury of this magnitude seen late Saturday night. And while Lyman could have implicated Tammarisk as the only other adult in the home the night of J.S.'s injury, he repeatedly told others she was asleep when he checked on J.S.

Issue 2: *Did the district court abuse its discretion in excluding Lyman's proposed expert witness for failure to satisfy the* Daubert *test?*

Lyman next argues the district court erroneously excluded evidence from his medical expert, Dr. Thomas Young.

*Facts*

The State filed a motion in limine arguing Dr. Young's methods were unique, not generally accepted in the scientific community, and not the result of reliable principles and methods. Additionally, he had not reliably applied the principles and methods to the facts of the case.

Dr. Young testified at the hearing on the motion that he had created what he alternately called the inferential test or "Young's postulate." He further testified he has held himself out as an expert and used his inferential test to testify for defense attorneys challenging findings of a pathologist in cases involving abusive head trauma.

Dr. Young applied his test to conclude a State witness, pediatrician Dr. Frazier, could not surmise child abuse solely from physical evidence. Young also applied his test to conclude that J.S.'s death did not involve trauma but rather his inability to breathe properly on several occasions.

24

Young admitted that no "thought leaders" in the forensic pathology field have adopted the inferential test, that no learned treatise in the field has adopted it, and that no model protocol has been created in the field based on it. The hearing record reveals Young admitted no published articles comment on his inferential test, it has no peer reviewed commentaries, and the "thought leaders" in his profession have refused to consider the topics he has covered.

At the conclusion of the hearing, the district court held Dr. Young was clearly qualified to testify based on his medical degree and specialization in forensic pathology. However, regarding his analysis of this case, the court observed that the inferential test Young created and applied here had not been peer-reviewed. The court specifically cited Dr. Young's admission that all of his testimony and opinions in this case were based on his inferential test. Ultimately, the district court granted the motion excluding Dr. Young's testimony, calling the test "junk science."

Two weeks later, the court completed a written journal entry summarizing its conclusions and decision to disqualify Dr. Young. In it the court found that in one of Young's publications, he stated, "I will prove to you beyond a reasonable doubt that the God of Abraham, Isaac and Jacob created 'the heavens and the earth' in six literal days." And there Young additionally explained "that his test also could be used to prove that the theory of evolution has no merit."

*Standard of review*

A district court's admission of expert testimony is generally reviewed for an abuse of discretion. To the extent interpretation of statutes is concerned, review is de novo. *In re Care & Treatment of Cone*, 309 Kan. 321, 325, 435 P.3d 45 (2019); see *State v. White,* 279 Kan. 326, 332, 109 P.3d 1199 (2005). "'A district court abuses its discretion if its

decision is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact."' *Mattox*, 305 Kan. at 1029-30.

*Discussion*

For many years, Kansas followed the test set out in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923); see *In re Girard,* 296 Kan. 372, 376, 294 P.3d 236 (2013). The *Frye* test requires that before expert scientific opinion may be admitted into evidence, the basis of the opinion must be generally accepted as reliable within the expert's particular field. 296 Kan. at 376.

Then in 2014, the Kansas statute governing expert testimony, K.S.A. 60-456(b), was changed to read as follows:

> "If scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue, a witness who is qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise if: (1) The testimony is based on sufficient facts or data; *(2) the testimony is the product of reliable principles and methods; and (3) the witness has reliably applied the principles and methods to the facts of the case*." (Emphasis added.) K.S.A. 2018 Supp. 60-456(b); L. 2014, ch. 84, § 2.

Earlier this year, we held that the 2014 changes now made K.S.A. 2018 Supp. 60-456(b) substantively identical to Federal Rule of Evidence 702, following the holding in *Daubert*, 509 U.S. 579; see *Cone*, 309 Kan. at 325. So we concluded the *Daubert* standard had been legislatively adopted in Kansas, and we applied it in *Cone*. 309 Kan. at 325, 327. Moreover, we have held other federal caselaw interpreting Federal Rules of Evidence can be persuasive. See *Fredricks v. Foltz*, 221 Kan. 28, 30, 557 P.2d 1252 (1976) (finding federal interpretations persuasive where state and federal rules similar).

26

We earlier observed that "*Daubert* demoted *Frye*'s test of 'general acceptance' from 'an absolute prerequisite to admissibility' to simply one factor to be considered in the admissibility calculus." *Girard*, 296 Kan. at 379 (quoting *Daubert*, 509 U.S. at 588). And in *Cone* we acknowledged *Daubert* required the trial judge to perform an evidentiary gatekeeping function.

"In *Daubert*, the Supreme Court recognized that the *Frye* test had been superseded by the adoption of the Federal Rules of Evidence. 509 U.S. at 587. However, the Court noted that this did not remove all qualifications for admissibility of scientific evidence; rather, the trial judge has a gatekeeping obligation to ensure that scientific evidence is relevant and scientifically reliable. 509 U.S. at 589." 309 Kan. at 327.

In *Cone,* we cited *Daubert* for the list of nonexclusive factors the district courts could consider when fulfilling that gatekeeping requirement, i.e., "to ensure the reliability and relevancy of expert testimony." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999). These are (1) whether the theory or technique can be (and has been) tested; (2) whether it has been subject to peer review and publication; (3) whether, in respect to a particular technique, there is a high known or potential rate of error and whether there are standards controlling the technique's operation; and (4) whether the theory or technique has general acceptance within a relevant scientific community. *Daubert*, 509 U.S. at 592-94; see *Kumho Tire,* 526 U.S. at 149-50 (specifying four standards); see also *Cone*, 309 Kan. at 328-32.

As we recognized in *Cone*,

"*Daubert* emphasized that these factors were not exclusive and that the trial court's overarching inquiry should be the scientific validity, evidentiary relevance, and reliability of the evidence. 509 U.S. at 593-95; see also *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147, 149-50, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999) (trial judge's gatekeeping

27

function applies to all expert testimony, not just scientific testimony, and a court may consider the *Daubert* factors when deciding admissibility)." 309 Kan. at 327.

These factors are nonexclusive because the reliability inquiry must be tied to the particular circumstances of the particular case. As the Supreme Court said in *Kumho Tire*, "*Daubert* makes clear that the factors it mentions do not constitute a 'definitive checklist or test.' [Citation omitted.] And *Daubert* adds that the gatekeeping inquiry must be 'tied to the facts' of a particular 'case.'" *Kumho Tire*, 526 U.S. at 150. In short, the inquiry is "a flexible one." *Daubert*, 509 U.S. at 594-95; *Kumho Tire*, 526 U.S. at 141; see *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311, 1317 (9th Cir. 1995) ("[W]e do not deem each of them to be equally applicable [or applicable at all] in every case."). And *Kumho Tire* teaches that "[t]he trial court must have the same kind of latitude in deciding *how* to test an expert's reliability . . . as it enjoys when it decides *whether or not* that expert's relevant testimony is reliable." 526 U.S. at 152.

The district court found Dr. Young was qualified to render his opinion by education and experience—thus meeting the first part of K.S.A. 2018 Supp. 60-456(b); see *Smart v. BNSF Ry. Co*., 52 Kan. App. 2d 486, 494, 369 P.3d 966 (2016) (under the statute, "the court must decide first whether the expert is qualified 'by knowledge, skill, experience, training or education' to render an opinion"). As with *Smart*'s expert, here those qualifications of Dr. Young are not in dispute. 52 Kan. App. 2d at 494.

The district court then proceeded to the next step and held Young's proposed testimony was not reliable under *Daubert*. See *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) ("[I]f the expert is sufficiently qualified, the court must determine whether the expert's opinion is reliable by assessing the underlying reasoning and methodology[.]"). The burden to show reliability and relevance was Lyman's. See *Nacchio*, 555 F.3d at 1241, 1251, 1256 n.21, 1258; *Daubert*, 43 F.3d at 1316 ("[T]he party presenting the expert must show that the expert's findings are based on sound

28

science, and this will require some objective, independent validation of the expert's methodology.").

At the motion in limine evidentiary hearing scheduled by the district court, Dr. Young extensively testified on direct, cross, redirect, and recross during 101 pages of transcript. Oral arguments immediately followed, and the court orally ruled his testimony would be excluded.

Two weeks later, after more thoroughly reviewing the exhibits from the hearing (Young's report, biography, different articles from his website, several news articles, Young's 56-page document, and an "abstract" of a presentation he gave at the World Forensic Festival, International Academy of Forensic Sciences), the court issued an 8-page order detailing the findings it made in its acknowledged gatekeeper role.

Among other things, it analyzed using the specific (yet nonexclusive) factors identified in *Daubert* as shown above. But the heart of its analysis was criticizing Dr. Young's self-created "inferential test" as unreliable. Essentially, his testimony was not "the product of reliable principles and methods" as required by K.S.A. 2018 Supp. 60-456(b). We now address that test.

Dr. Young defined his inferential test as follows:

"[O]ne can be reasonably certain if *witness accounts* of the past are consistent or not consistent with physical evidence in the present, but *one cannot reliably surmise past events from physical evidence unless there's only one plausible explanation for that evidence*." (Emphases added.)

In short, Young explained that one must consider (1) past events, e.g., eyewitness accounts and (2) current physical evidence. But alone, "the use of a forensic test to surmise complex *past* events [here, such as cause of death] is so unreliable that such

29

testing should be considered junk science no matter how well the test performs."
(Emphasis added.)

As he restated,

> "[W]ithout a witness account, we really do not know what happened in the vast majority
> of cases. Science is not a remedy for a lack of knowledge that can only be learned
> through witness accounts. Science does not take the place of absent witness accounts.
> Instead, forensic science and the other past event sciences are to be used to *test* witness
> accounts . . . for veracity. *Anything beyond that is . . . junk science*." (Emphasis added.)

The district court found, according to Dr. Young's testimony, "that no other forensic pathologists use this test and that it has not been accepted by the field nor has it been peer reviewed. . . [H]e follows no generally accepted means for coming to his conclusion." Moreover, "his method of arriving at a diagnosis are bizarre and out of tune with ALL other forensic scientists." Further, it is a "faulty, untested, un-peer reviewed, theory that only he has adopted."

Young repeatedly testified he applied his inferential test to reach his multiple conclusions about the cause and manner of J.S.'s death. But he orally altered his test, and its application, even more narrowly as evidenced by the following exchange:

> "Q:  [I]f the only witness to a homicide is a dead child, we can't conclude how the
> child died because we don't have any witnesses?

> "A:  [1] Only if you can demonstrate through a circumstantial evidence situation *that
> it is the only plausible explanation.* [2] *And even in those cases, you require
> witnesses.*" (Emphasis added.)

The import of Dr. Young's inferential test can be summarized by this exchange with the prosecutor during his testimony:

30

"Q: . . . So in a case where we have a number of undisputed findings from an autopsy, whatever they are, if there are multiple possible causes, this particular inferential test would prevent concluding that it was caused by any one cause. Correct?

"A: Sure."

The district court concluded in its journal entry,

"Under Dr. Young's postulate [test], nobody could ever be convicted for a murder which was unwitnessed. The remedy would be archaic. Dr. Young espouses a test that is far afield from *our present legal system that allows circumstantial evidence into a case and may form the only evidence needed for conviction.* In his testimony, Dr. Young accused forensic experts of using junk science. This court believes that it is Dr. Young who uses junk science." (Emphasis added.)

As shown above, the district court ruled that several of *Daubert*'s listed (but nonexclusive) factors clearly had not been met. These include (1) the technique or theory has not been tested; (2) it has not been subject to peer review and publication; and (3) it has not been generally accepted in the scientific community.

As in *Cone*, the court also considered factors not listed in *Daubert*. First, Young's inferential test was indeed contrary to several fundamental tenets of Kansas evidence law: (a) "There is no distinction between direct and circumstantial evidence in terms of probative value." *State v. Evans*, 275 Kan. 95, 105, 62 P.3d 220 (2003); and (b) "A conviction of even the gravest offense can be based entirely on circumstantial evidence and the inferences fairly deducible therefrom." *State v. McCaslin*, 291 Kan. 697, Syl. ¶ 9, 245 P.3d 1030 (2011), *overruled on other grounds by State v. Astorga*, 299 Kan. 395, 324 P.3d 1046 (2014).

31

Second, the district court considered "[w]hether experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying," citing *Daubert*, 43 F.3d at 1317. There, the *Daubert* court explained, "That the testimony proffered by an expert is based directly on legitimate preexisting research unrelated to the litigation provides the most persuasive basis for concluding that the opinions he expresses were 'derived by the scientific method.'" 43 F.3d at 1317. The 9th Circuit coupled the experts' lack of preexisting or independent research with their lack of peer review and publication to conclude, "It's as if there were a tacit understanding within the scientific community that what's going on here is not science at all, but litigation." 43 F.3d at 1318.

Here the district court found Dr. Young was no longer a coroner—and that he uses the inferential test to testify for defense attorneys challenging findings of a pathologist in cases involving abusive head trauma. After reviewing Young's web page, the court "believe[d] that his opinions were developed for purposes of testifying for defendants charged with child abuse." The court added that the web page "specifically calls upon public defenders to hire him as a defense to these types of cases" and "[h]is opinions are tailor-made for defense of child abuse cases and especially those concerning death of a child."

Third, the court also considered another Kansas trial court's treatment of Dr. Young's testimony described in *State v. Harber*, No. 97,372, 2008 WL 4471380 (Kan. App. 2008) (unpublished opinion). There, Young testified at a hearing on a motion to withdraw a plea in a case involving the death of a baby based on massive head trauma without firsthand witnesses. The district court in *Harber* clearly found Young was not credible and stated he was "'simply out of step with the undisputed facts of the case . . . . So this was a very rare instance where the Court found that the medical testimony from licensed physicians was so wide [of] the mark that it was not worthy of any belief.'" 2008

WL 4471380, at *6. The Court of Appeals declined Harber's invitation to reweigh the evidence or evaluate witnesses credibility. Accordingly, it declined to substitute its judgment for that of the district court excluding Young's testimony.

Based on all the above, we cannot conclude the district judge here abused his discretion in excluding Dr. Young's testimony for the doctor's failure to meet *Daubert*. As the *Daubert* Court itself said about peer acceptance or even commentary, "[S]ubmission to the scrutiny of the scientific community is a component of 'good science,' in part because it increases the likelihood that substantive flaws in methodology will be detected." 509 U.S. at 593. So, "[t]he fact of publication (or lack thereof) in a peer reviewed journal thus will be a relevant, though not dispositive, consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised." 509 U.S. at 594. We acknowledge that a "'reliability assessment does not require, although it does permit, explicit identification of a relevant scientific community and an express determination of a particular degree of acceptance within that community.'" 509 U.S. at 594. But, "[w]idespread acceptance can be an important factor in ruling particular evidence admissible, and 'a known technique which has been able to attract only minimal support within the community,' [*United States v.*] *Downing,* 753 F.2d [1224,] 1238 [(1985)], *may properly be viewed with skepticism.*" (Emphasis added.) 509 U.S. at 594.

The Court's decision in *Kumho Tire*, 526 U.S. at 157, is also illustrative. In affirming the district court's refusal to allow expert witnesses to testify, the Court "found no indication in the record that other experts in the industry use [expert's two-factor test]" and noted that the parties did not refer "to any articles or papers that validate [expert's] approach." See *Daubert*, 43 F.3d at 1318 n. 9 ("That plaintiffs' experts have been unable or unwilling to publish their work undermines plaintiffs' claim that the findings these experts proffer are 'ground[ed] in the methods and procedures of science' and 'derived by the scientific method.' *Daubert,* 509 U.S. at 590, 113 S. Ct. at 2795, 2796.").

In addition to these problems, as previously mentioned the undergirding of Young's inferential test contradicts longstanding principles of our evidentiary caselaw. *Evans*, 275 Kan. at 105 ("no distinction between direct and circumstantial evidence in terms of probative value"); *McCaslin*, 291 Kan. 697, Syl. ¶ 9 ("conviction of even the gravest offense can be based entirely on circumstantial evidence and inferences fairly deducible therefrom").

At oral arguments before this court, Lyman's appellate counsel pointed out that after the judge excluded Dr. Young's testimony, his trial counsel asked that Young nevertheless be allowed to testify in some fashion. "I think you can forbid him [Dr. Young] to . . . tell his thought processes but I don't think you can prevent him from testifying as to *reasonable medical certainty*" as he opined in his letter report. (Emphasis added.) Appellate counsel then essentially asked this court to "slice" Dr. Young's opinions, separating those reached using the inferential test from those that are not—and allowing the latter as evidence.

We must decline counsel's invitation for several reasons. First, Dr. Young testified he applied the court-rejected inferential test to reach all of his conclusions about the cause and manner of J.S.'s death. So we cannot slice, separate, and salvage any conclusions he reached in not applying this test. Second, simply saying—without explanation of his thought process—that he formed his opinions "to reasonable medical certainty" does not mean he actually did so. Cf. *Nacchio*, 555 F.3d at 1258 ("'The trial court's gatekeeping function requires more than simply "'taking the expert's word for it.'"' [Citation omitted.] '[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.' *Joiner*, 522 U.S. at 146.").

Third, the overarching subject of the inquiry is the evidentiary relevance and *reliability of the principles* that underlie a proposed expert submission. *Daubert*, 509 U.S. at 594-95. In other words, "The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." 509 U.S. at 595; *Nacchio*, 555 F.3d at 1241 ("In making a reliability determination, '[g]enerally, the district court should focus on an expert's methodology rather than the conclusions it generates.'"); *Daubert*, 43 F.3d at 1318 ("[T]he test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology.").

In short, Dr. Young's principles and methodology are flawed. So we do not examine—in a vacuum—whether his opinions are within reasonable medical certainty. As our Court of Appeals stated in *Smart*,

> "despite the flexibility granted to district courts, the text of our statute requires them to ensure that proffered expert testimony is based on sufficient facts or data and *is the product of reliable principles and methods*, and that the witness has reliably applied the principles and methods to the facts of the case. K.S.A. 2015 Supp. 60-456." (Emphasis added.) 52 Kan. App. 2d at 500.

There, the Court of Appeals concluded there was "no showing that he applied to those facts *a reliable principle and method* to reach his conclusions." (Emphasis added.) 52 Kan. App. 2d at 500.

And finally, we agree "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable. That is to say, a trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony." *Kumho Tire*, 526 U.S. at 152. As a result, "whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." 526 U.S. at 153.

We conclude Lyman failed to show the district court abused its discretion.

Issue 3: *Did the district court err by allowing the State to introduce evidence of Lyman's prior bad acts?*

The State had filed a pretrial motion to admit evidence of Lyman's prior abuse of J.S., arguing it should be admitted to show modus operandi, intent, or absence of mistake or accident under K.S.A. 60-455. The evidence included several photographs of J.S. found on Lyman's phone, those later described at trial by Detective Arnold.

The State proffered that these pictures taken on July 25—about a month and a half before J.S.'s death—showed Lyman abusing J.S. by pressing his fingers into J.S.'s eyes and forehead, causing bruising on his eyes and forehead, and then posing the bruised J.S. with a pacifier that said, "bad seed." It argued the evidence showed the identity of the perpetrator and his modus operandi—abusing the child by applying a hand to the head forcefully enough to leave bruises—because the later autopsy photographs showed very similar bruising patterns. The State characterized the July incident as a dry run for J.S.'s September abuse and death.

The State also proffered that the same day as those photos M.S. noticed head and waist bruising on J.S. and contacted Tammarisk, asking what had happened to her son.

Lyman responded to the motion by arguing other people were around that day and one of them could have caused the injuries. But he did not object to identifying him as the one in the photos pressing in J.S.'s eyes with his hand.

The court ruled the evidence was relevant to show a pattern of abuse and would be admissible at trial because it was not more harmful than probative. It later gave the jury

36

an instruction limiting this evidence "solely for the purpose of proving defendant's intent and Modus Operandi" (which it defined as "the general method used by a defendant to perpetuate a similar but totally unrelated act").

Lyman contends the evidence was not relevant to the crimes charged; but if so, it was more prejudicial than probative. Specifically, Lyman challenges the admission of the pictures from Lyman's phone showing him covering or poking J.S.'s eyes. Lyman argues the error was exacerbated by the admission of the picture of J.S. with a pacifier in his mouth saying "bad seed."

The State counters that the pictures and the bad seed nickname are not K.S.A. 60-455 evidence as they are not a crime or a civil wrong.

*Standard of Review*

When reviewing the admission of evidence under K.S.A. 2018 Supp. 60-455(b), the court follows a three-step analysis:

"'First, the trial court must determine whether the fact to be proven is material under K.S.A. [2017] Supp. 60-455(b). That is whether it relates to one of the material facts identified in that provision—motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident—or some other material fact other than propensity to commit crime. To be material the fact must have some real bearing on the decision in the case. An appellate court reviews this determination independently, without any required deference to the trial court.

"'Second, the trial court must determine whether the material fact is disputed. If so, the trial court must also determine whether the evidence is probative of the disputed material fact, that is, whether it has any tendency in reason to prove the fact. An appellate court reviews this determination for an abuse of discretion.

"'Third, the trial court must determine whether the probative value of the evidence outweighs the potential for producing undue prejudice to the defendant. An appellate court's standard for reviewing this determination is also abuse of discretion. [Citations omitted.]' *State v. Barber*, 302 Kan. 367, 374-75, 353 P.3d 1108 (2015)." *State v. Anderson*, 308 Kan. 1251, 1257, 427 P.3d 847 (2018) (applying these steps in a child abuse case).

See also *State v. Gunby*, 282 Kan. 39, 56, 144 P.3d 647 (2006) (describing the steps for analysis of 60-455 evidence).

*Discussion*

The statute itself, K.S.A. 2018 Supp. 60-455, provides in relevant part:

"(a) Subject to K.S.A. 60-447, and amendments thereto, evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove such person's disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion.

"(b) Subject to K.S.A. 60-445 and 60-448, and amendments thereto, such evidence is admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

"(c) Subject to K.S.A. 60-445 and 60-448, and amendments thereto, in any criminal action other than a criminal action in which the defendant is accused of a sex offense under articles 34, 35 or 36 of chapter 21 of the Kansas Statutes Annotated, prior to their repeal, or articles 54, 55 or 56 of chapter 21 of the Kansas Statutes Annotated, or K.S.A. 2018 Supp. 21-6104, 21-6325, 21-6326 or 21-6419 through 21-6422, and amendments thereto, *such evidence is admissible to show the modus operandi or general method used by a defendant to perpetrate similar but totally unrelated crimes when the method of committing the prior acts is so similar to that utilized in the current case*

38

*before the court that it is reasonable to conclude the same individual committed both acts*." (Emphasis added.)

Here, despite the State's claim, the photographs with Lyman's hand on J.S.'s face constitute evidence under K.S.A. 2018 Supp. 60-455. First, they document the assault of a child sufficient to visibly distress him and leave bruises on his face. See K.S.A. 2018 Supp. 60-455(a) (evidence that a person committed a crime). Second, they are so similar to the September medical observations and conclusions (regarding use of a hand or other means forcefully enough to leave bruises on the same general areas of J.S.'s face) that "it is reasonable to conclude the same individual committed both acts"—in July and then in September. Third, they are relevant to show Lyman's modus operandi, a disputed material fact. See *State v. Prine*, 297 Kan. 460, 465, 475, 479-80, 303 P.3d 662 (2013) (*Prine II*) (discussing 2009 legislative additions to 60-455 subsection [c], which were an "apparent effort to modify the 'strikingly similar' or 'signature' standard enunciated in *Prine I*" [*State v. Prine*, 287 Kan. 713, Syl. ¶ 6, 200 P.3d 1 [2009]).

In their effect, these "hand" photographs contradict Lyman's claim that J.S.'s previous health and respiratory issues—and not Lyman—caused his death. Moreover, the district court did not err in its next step: finding their probative value outweighed their prejudicial value. See *Anderson*, 308 Kan. at 1257. Among other things, the jury additionally knew that during a break from police questioning, Lyman admitted aloud to himself that "[m]y life is over." And it already knew that after Lyman learned from Tammarisk of some issues J.S. was having just three days before J.S.'s death, Lyman responded "leave [J.S.] to his own demise." And of course numerous physicians opined J.S. died of physical trauma to his head—caused while in Lyman's custody.

And even if it were error to admit this evidence, there was other unchallenged evidence that Lyman injured J.S. on that July day in Ohio before the move to Kansas. This includes the testimony of M.S. and T.S. and the text messages between Tammarisk

39

and M.S. on "Ice Mom's" phone about J.S.'s bruises. See *Barber*, 302 Kan. at 375 ("[E]ven if we assume that the admission was erroneous under K.S.A. 60-455, we could not reverse on that basis. Other testimony, not challenged by Barber on appeal, was bound to inflict the same or greater damage than that inflicted by Brown's testimony on the defense case.").

Finally, Lyman is unclear whether he claims the court erred in admitting the "bad seed" photo or merely whether its already damaging effect was exacerbated by the hand photographs. Assuming the former, we see no error because it was relevant to show marks, e.g., bruising on J.S.'s face on July 25. The bad seed pacifier also showed Lyman's attitude toward J.S., i.e., his motive. See *State v. Carapezza,* 286 Kan. 992, 999, 191 P.3d 256 (2008) (State may admit evidence of motive to explain why the defendant may have committed the crime or crimes at issue even though motive is not an element of the offense). Moreover, as Lyman himself acknowledges, the district court rejected many other prosecutorial attempts to reference "bad seed"—which lessened the photo's prejudicial effect.

Issue 4: *Did the district court judge commit judicial misconduct by sleeping during the trial?*

After the jury's verdict, Lyman filed a "Motion for Change of Judge" for the remainder of the posttrial matters and attached a hand-written letter from one of the trial spectators. The Reverend Richard Elliott stated he "observed on various occasions what appeared to me to be the judge sleeping."

The district's chief judge, Michael Powers, reviewed the motion and later issued an order, noting the technical inadequacies of Lyman's filing under K.S.A. 20-311d. Specifically, Lyman's request failed to follow the format of a motion or an affidavit. But Judge Powers reviewed the merits of the request anyway and concluded it had none.

40

Lyman concedes he did not ask for a mistrial but submits the issue of a judge sleeping during a criminal trial is structural and may be raised at any time. He cites the Court of Appeals opinion in *State v. Johnson*, 53 Kan. App. 2d 734, 391 P.3d 711 (2017), *rev'd* 310 Kan. 909, 453 P.3d 281 (2019).

The State responds no record evidence exists to show Judge Hornbaker was asleep during the trial. It argues Lyman's only support is the letter from Elliott who is from the Ohio hometown of Lyman's family, and points out the letter is not notarized. The State distinguishes the facts here from those in *Johnson* because there the judge admitted he was sleeping.

*Standard of review*

Appellate courts have unlimited review over allegations of judicial misconduct. *State v. Moyer*, 306 Kan. 342, 369-70, 410 P.3d 71 (2017) (unlimited review over whether a trial court judge's recusal is required); *State v. Robinson*, 293 Kan. 1002, 1032, 270 P.3d 1183 (2012) (unlimited review in evaluating an affidavit in support of a motion for recusal filed under K.S.A. 20-311d).

The party alleging judicial misconduct bears the burden of establishing that misconduct occurred and that the misconduct prejudiced the party's substantial rights. *State v. Hudgins*, 301 Kan. 629, 637-38, 346 P.3d 1062 (2015). See also *State v. Boothby*, 310 Kan. 619, 625, 448 P.3d 416 (2019) (citing *State v. Miller*, 308 Kan. 1119, 1154, 427 P.3d 907 [2018] (defendant must demonstrate the misconduct prejudiced his substantial rights). Furthermore, an allegation of judicial misconduct is reviewable on appeal despite the lack of a contemporaneous objection when the defendant claims that the right to a fair trial was violated. *State v. Kemble*, 291 Kan. 109, 113, 238 P.3d 251 (2010).

*Discussion*

The procedure for a change of judge is provided in K.S.A. 20-311d:

"(a) If a party or a party's attorney believes that the judge to whom an action is assigned cannot afford that party a fair trial in the action, the party or attorney may file a motion for change of judge. The motion shall not state the grounds for the party's or attorney's belief. The judge shall promptly hear the motion informally upon reasonable notice to all parties who have appeared in the case. If the judge disqualifies the judge's self, the action shall be assigned to another judge by the chief judge. *If the judge refuses to disqualify the judge's self, the party seeking a change of judge may file the affidavit provided for in subsection (b)*. If an affidavit is to be filed it shall be filed immediately.

"(b) *If a party or a party's attorney files an affidavit alleging any of the grounds specified in subsection (c), the chief judge shall at once determine*, or refer the affidavit to another district judge for prompt determination of, *the legal sufficiency of the affidavit*. If the affidavit is filed in a district court in which there is no other judge who is qualified to hear the matter, the chief judge shall at once notify the departmental justice for the district and request the appointment of another district judge to determine the legal sufficiency of the affidavit. *If the affidavit is found to be legally sufficient, the case shall be assigned to another judge*.

"(c) Grounds which may be alleged as provided in subsection (b) for change of judge are that:

(1) The judge has been engaged as counsel in the action prior to the appointment or election as judge.

(2) The judge is otherwise interested in the action.

(3) The judge is related to either party to the action.

(4) The judge is a material witness in the action.

(5) *The party or the party's attorney filing the affidavit has cause to believe and does believe that on account of the personal bias, prejudice or interest of the judge such party cannot obtain a fair and impartial trial or fair*

42

*and impartial enforcement of post-judgment remedies. Such affidavit shall state the facts and the reasons for the belief that bias, prejudice or an interest exists.*

"(d) *In any affidavit filed pursuant to this section*, the recital of previous rulings or decisions by the judge on legal issues or concerning the legal sufficiency of any prior affidavits filed by counsel for a party in any judicial proceeding, or filed by such counsel's law firm, pursuant to this section, shall not be deemed legally sufficient for any belief that bias or prejudice exists." (Emphases added.)

In its de novo review of the legal sufficiency of an affidavit in support of a motion for a change of judge, the appellate court must decide sufficiency, not the truth of the facts alleged. *Robinson*, 293 Kan. at 1032.

As the language of K.S.A. 20-311d and *Robinson* make plain, under our facts an affidavit was required for the chief judge to review. And an affidavit is defined as, "'a written statement, under oath, sworn to or affirmed by the person making it *before some person who has authority to administer an oath or affirmation*.'" (Emphasis added.) *State ex rel. Secretary of DCF v. Smith*, 306 Kan. 40, 50, 392 P.3d 68 (2017) (quoting *State v. Knight*, 219 Kan. 863, 867, 549 P.2d 1397 [1976]). Here, no reference to a person with such oath-administration authority appears in any document filed by Lyman. Moreover, while his motion is subtitled "Affidavit," it is signed only by counsel, the purported affiant. Similarly, Elliott's attached letter is signed only by him. Cf. *Knight*, 219 Kan. at 867 (when purported affidavit is simply acknowledged before a notary public, requirements for affidavit are not met). So the requirements of K.S.A. 20-311d for changing a judge have not been met. 219 Kan. at 868 (holding where no "affidavit" is filed, a motion for change of judge under 20-311d is insufficient and must fail).

Even reviewing Lyman's motion on the merits, the record does not show Lyman objected during trial, requested a sidebar, or otherwise observed a sleeping judge. But his counsel was observant enough to notice—and make a record—that the judge seemed

43

emotional during M.S.'s testimony. As the State points out, this was a hotly contested jury trial with numerous issues and objections during the trial. And the record does show the court actively engaged with and responsive to the parties, jury, witnesses—and at times the observers in the court room, asking them to refrain from disrupting the proceedings.

Finally, we agree with the State that this case is factually distinguishable from *Johnson*, 53 Kan. App. 2d at 734. There the judge admitted to nodding off. In our recent review of that Court of Appeals decision, we held that under the circumstances not even a judge who admits to brief nodding off constitutes structural error in a trial. See *State v. Johnson*, 310 Kan. 909, 919, 453 P.3d 281, 287 (2019).

Issue 5: *Did the district court err by prohibiting Lyman from introducing medical records that were subject to a written stipulation?*

Lyman argues his right to a fair trial was unduly prejudiced when, after the district court excluded Dr. Young from testifying, it then sustained the State's objection to the introduction of medical records, even though they were subject to a stipulation.

The State admits a stipulation existed to waive all hearsay or foundation objections to the medical records for direct and cross-examination at trial. But it argues that because Young did not testify, the records he reviewed to form his opinion were not covered by the stipulation.

*Standard of Review*

We apply an abuse of discretion standard of review to a district court's ruling on the enforceability of a stipulation. *Hardesty v. Coastal Mart, Inc*., 259 Kan. 645, 650, 915 P.2d 41 (1996). "'A district court abuses its discretion if its decision is (1) arbitrary,

44

fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact."' *Mattox*, 305 Kan. at 1029-30.

*Discussion*

The signed stipulation states in relevant part that the parties "agree to waive hearsay or foundation objections at trial . . . as to the admissibility of medical records utilized to form the basis of the opinion of an expert witness under K.S.A. 60-456 and K.S.A. 60-458." Counsel for the State explained to the court, without objection, that "[w]e've stipulated to the admissibility of medical records *that form the basis of opinion of people for purposes of their* direct and cross-examination." (Emphasis added.)

During trial, the State's counsel argued there "was a stipulation where the medical records were relevant for experts to consider in reaching their conclusions." And because Dr. Young would not be testifying about his conclusions, the State was concerned that Lyman would simply offer medical records that obviously could not form the basis of his opinion. The State objected, and the court sustained.

Lyman's brief does not explain how prohibiting introduction of the medical records actually prejudiced his right to a fair trial. But we observe the record discloses that when Dr. Young was excluded from testifying, Lyman did not have a witness available to introduce the medical records from J.S.'s earlier medical treatment. Some of this evidence was admitted other ways, however, such as M.S.'s testimony about J.S.'s earlier hospitalizations for RSV and the State's medical experts who testified about eliminating other causes of death in concluding J.S. died from child abuse.

Based upon the language of the stipulation and its accompanying explanation—to which Lyman did not object—we cannot conclude the district court abused its discretion. See *Mattox*, 305 Kan. at 1029-30.

45

Issue 6: *Did cumulative errors require reversal and remand for a new trial?*

In his final argument, Lyman alleges cumulative errors denied him a fair trial. He argues that the combination of the judge's prohibiting Dr. Young from testifying, allowing the K.S.A. 60-455 evidence of Lyman's prior bad acts, sleeping during the trial, and failing to grant a new trial based on Biggs' exculpatory evidence warrants a new trial. He specifically claims a new trial is necessary due to these errors and the fact that the evidence was not overwhelming—i.e., even if we conclude J.S. died as the result of child abuse, no evidence directly ties Lyman to the fatal acts. To that end, he points out a number of witnesses testified he was a loving father and caregiver.

*Standard of Review*

This court uses a de novo standard when determining whether the totality of circumstances substantially prejudiced a defendant and denied a fair trial based on cumulative error. *Anderson*, 308 Kan. at 1266.

*Discussion*

Cumulative error, considered collectively, may be so great as to require reversal of a defendant's conviction. *Anderson*, 308 Kan. at 1266-67. But because there are no errors to accumulate, this last argument has no merit. And even assuming error in admitting K.S.A. 60-455 evidence, a single error cannot constitute cumulative error. *State v. Houston*, 289 Kan. 252, 277, 213 P.3d 728 (2009) ("The presence of one error is obviously insufficient to accumulate.").

The judgment of the district court is affirmed.

46

PATRICK D. MCANANY, Senior Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:**  Senior Judge McAnany was appointed to hear case No. 114,312 under the authority vested in the Supreme Court by K.S.A. 20-2616 to fill the vacancy on the court by the retirement of Justice Lee A. Johnson.