IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 116,801

In the Matter of the Care and Treatment
of MATTHEW C. CONE.

SYLLABUS BY THE COURT

Under the *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), standard for admissibility of expert testimony, as codified in this state under K.S.A. 2017 Supp. 60-456(b), the district court did not abuse its discretion in admitting expert testimony on the Static-99R and Static-2002R actuarial tools, used to estimate a sex offender's risk of reoffending.

Review of the judgment of the Court of Appeals in an unpublished opinion filed August 25, 2017. Appeal from Clay District Court; JOHN F. BOSCH, district judge. Opinion filed February 22, 2019. Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

*Sam S. Kepfield*, of Hutchinson, argued the cause and was on the brief for appellant.

*Bryan C. Clark*, assistant solicitor general, argued the cause, and *Derek Schmidt*, attorney general, was with him on the briefs for appellee.

PER CURIAM:  Matthew Cone seeks review of the Court of Appeals' decision affirming his involuntary commitment under the Kansas Sexually Violent Predator Act (SVPA), K.S.A. 59-29a01 et seq. Cone challenges the Court of Appeals' holding that the district court did not abuse its discretion in finding that the actuarial tools used to estimate sex offenders' risk of reoffending met the *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), standard

1

for admissibility of expert testimony. Cone also contends that the evidence was insufficient to support the jury's verdict that he met the SVPA's definition of a sexually violent predator. We affirm.

FACTUAL AND PROCEDURAL SUMMARY

For acts committed in 2012, Cone was convicted of aggravated indecent solicitation of a child less than 14 years of age and sentenced to 36 months in prison. Shortly before his release from prison in November 2014, the State filed a petition to involuntarily commit Cone to the Larned State Hospital under the SVPA. To effect the commitment, the State had to prove that Cone met the definition of a sexually violent predator, which included establishing that he suffers from a mental abnormality or personality defect that makes him likely to commit repeat acts of sexual violence. The State planned to meet that burden through the use of expert witnesses who would rely in part on the Static-99R and Static-2002R tests, which are actuarial tools used to estimate sex offenders' risk of reoffending.

Before the SVPA jury trial, Cone sought to exclude evidence of the results of the Static-99R and Static-2002R tests by challenging their relevance and reliability. At the hearing on the admissibility of the Static tests, the district court heard testimony from all three experts who went on to testify at Cone's trial as well as two additional experts for the State, psychologists Dr. Derek Grimmell and Dr. Thomas Kinlen. The district court applied the *Daubert* standard, which was adopted in this state in 2014. See K.S.A. 2017 Supp. 60-456(b). Using the *Daubert* factors, the district court found it was more likely than not that the actuarial tests were scientifically reliable and admissible.

At trial, the State proffered the expert testimony of two doctors, Carol Crane and Angelina Johnson. Dr. Crane reviewed Cone's history, reviewed a police affidavit

2

discussing one of Cone's victims' statements, interviewed Cone, and used the Static-99R and Static-2002R tools to determine Cone's risk of recidivism rate. Dr. Crane diagnosed Cone with pedophilic disorder and opined that he met the criteria for commitment as a sexually violent predator. Dr. Crane was concerned that Cone's sexual interest in children had not been sufficiently addressed; he had difficulties in relaying what he had learned in a sexual offender treatment program, which called into question whether he could utilize what he had learned in treatment when he was released into the community. The doctor also pointed to past incidents that demonstrated Cone's poor impulse control. For instance, when he was age 16, Cone and some friends set fire to a park bathroom. On another occasion, Cone broke into a house that he thought was abandoned and jammed a screwdriver into an electrical outlet.

Dr. Johnson also concluded that Cone is a sexually violent predator. In conducting her evaluation, Dr. Johnson relied on her review of Cone's records, a forensic interview, and the Static tools. Dr. Johnson also diagnosed Cone with pedophilic disorder, but she included the additional diagnosis of antisocial personality disorder. Dr. Johnson said that Cone's antisocial personality disorder contributed to his likelihood to reoffend because a key feature of the disorder is a persistent disregard for the rights and welfare of others and persistent recurrent opposition to the law. Dr. Johnson testified that Cone's antisocial personality and pedophilic disorders were "a dangerous combination for somebody that struggles in the way Mr. Cone does." She discussed Cone's inability to control his behavior, pointing to Cone's description of sexual abuse against a four-year-old victim as beginning with Cone tickling the child and proceeding to abuse because he was unable to resist an urge.

Dr. Johnson was also concerned that Cone did not seem to have retained the information from the prison's sexual offender treatment program and she believes that Cone lacks the tools to cope with urges toward children. Further, his relapse prevention

3

plan was not adequate because Cone did not understand what triggered his arousal and did not grasp the coping skills needed to deal with such arousal.

As stated above, both of the State's experts utilized the Static-99R and Static-2002R actuarial risk assessment tools in their evaluations. These tests are actuarial scores that rely on objectively scored risk factors, or historical data, that research has indicated can predict future behavior. Dr. Crane gave Cone a score of 6 (out of 10) on the Static-99R, while Dr. Johnson gave a score of 5. Those scores placed Cone's risk of reoffending in the range of 13.8 to 23 percent, which fall into the moderate and high risk categories. On the Static-2002R, both doctors arrived at a score of 8, with a 29 to 40 percent risk of being rearrested for a new sexual offense, placing Cone in the moderate-to-high risk category.

The defense countered with its own expert, Dr. Robert Barnett. In preparing his evaluation, Dr. Barnett reviewed records, conducted a forensic interview of Cone, and administered testing. Dr. Barnett disagreed with the pedophilic disorder and antisocial personality disorder diagnoses of the State's experts. He related that Cone had said that he was embarrassed and ashamed about his behavior and was committed to not repeating it. Dr. Barnett opined Cone had a relatively good ability to control his behavior.

Dr. Barnett testified that he does not use the Static assessments because the idea that you can accurately predict the percentage of probability that a person will reoffend is invalid. He characterized the tests as a misuse of statistics and probability because generalized group data cannot be applied meaningfully to an individual.

Nevertheless, Dr. Barnett testified that he had reviewed an unsigned Static-99R test in Cone's records that reflected a risk assessment score of 4. Dr. Barnett opined that based upon the information that Cone had lived with a female partner for more than two

4

years, the score should have been 3. He then opined that his score of 3, Dr. Johnson's score of 5, and Dr. Crane's score of 6 were not unusual for this test because it is given by people who are not trained and not licensed to practice psychology.

Cone also testified on his own behalf. He described a chaotic childhood, which included multiple moves, family drug use, and foster care placement. Cone related that he had been molested by a preacher when he was six years old, although he never told anyone about it because the preacher had warned Cone that he would go to hell if he told.

When Cone was 15, he was adjudicated for two counts of endangering a child because he bribed his 6-year-old nephew with candy and molested him two to three times. When Cone was 21, he was convicted of aggravated indecent solicitation of a child less than 14 as a result of abusing his cousin's girlfriend's 4-year-old daughter. Cone testified that he was asleep and dreaming about his own sexual abuse as a child. When he awoke, the child was there and asked Cone to scratch her stomach. Cone went further and asked the child to pull her pants down so he could touch her.

The jury found that Cone was a sexually violent predator subject to involuntary commitment. Cone filed a motion for judgment notwithstanding the verdict arguing, *inter alia*, that the Static tests should not have been admitted and that the evidence was insufficient to support the jury verdict. The district court denied the motion.

Cone timely appealed to the Court of Appeals. The panel held that the district court did not abuse its discretion in admitting expert testimony regarding the Static-99R and Static-2002R actuarial risk assessment tools under the *Daubert* standard. *In re Care & Treatment of Cone*, No. 116,801, 2017 WL 3668891, at *3-6 (Kan. App. 2017) (unpublished opinion). Further, the panel noted that this case did not present the overwhelming evidence often seen in sexually violent predator commitments, but that

5

viewing the evidence in a light most favorable to the State, the panel found sufficient evidence to support the jury's verdict. 2017 WL 3668891, at \*9. This court granted Cone's petition for review.

## ADMISSIBILITY OF EXPERT TESTIMONY ON RISK ASSESSMENT TOOLS

With regard to expert testimony, the issue raised and argued by the parties throughout this case, which issue was the only one decided by the lower courts, is whether expert testimony on the results of the actuarial risk assessment tools—the Static-99R test and the Static-2002R test—is admissible under the *Daubert* standard, as adopted in this state by K.S.A. 2014 Supp. 60-456(b). That statutory provision is substantively identical to Federal Rule of Evidence 702, which was amended in 2000 to follow the holding in *Daubert*. Our statute now reads as follows:

> "If scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue, a witness who is qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise if: (1) The testimony is based on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has reliably applied the principles and methods to the facts of the case." K.S.A. 2017 Supp. 60-456(b).

*Standard of review*

A district court's admission of expert testimony is generally reviewed for an abuse of discretion. *In re Care & Treatment of Girard*, 296 Kan. 372, 376, 294 P.3d 236 (2013). To the extent interpretation of statutes is concerned, review is de novo. *Neighbor v. Westar Energy, Inc.*, 301 Kan. 916, 918, 349 P.3d 469 (2015).

6

*Analysis*

Before analyzing the issue put before us by the parties and the lower courts, we pause to note that the parties do not argue *Daubert* is the incorrect standard to apply in a SVPA proceeding. The State's supplemental brief asserts that the issue of whether the *Daubert* standard applies in a SVPA proceeding is not before this court because the district court applied *Daubert* and the State did not cross-appeal this finding. We recognize that a provision in the SVPA states as follows:

"*Notwithstanding K.S.A. 60-456*, and amendments thereto, at any proceeding conducted under K.S.A. 59-29a01 et seq., and amendments thereto, the parties shall be permitted to call expert witnesses. The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If the facts or data are of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, such facts and data need not be admissible in evidence in order for the opinion or inference to be admitted." (Emphasis added.) K.S.A. 2014 Supp. 59-29a06(c).

See also L. 2011, ch. 92, § 3 (adding this section to the statute).

One might ruminate on the effect of the proviso—"[n]otwithstanding K.S.A. 60-456"—on the Legislature's subsequent adoption of the *Daubert* standard in K.S.A. 2014 Supp. 60-456(b). But at the time that provision became effective, Kansas courts were analyzing the admissibility of scientific testimony from expert witnesses under the standard announced in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). The *Frye* test required that, to be admissible, expert opinion testimony had to be generally accepted as reliable within the expert's particular field. In *Girard*, decided after the effective date of K.S.A. 2011 Supp. 59-29a06(c) and before the 2014 "*Daubert* amendment" to K.S.A. 60-456(b), this court declared that the admission of scientific evidence in a SVPA action had

7

to pass the *Frye* test, 296 Kan. at 376; that the actuarial tests used to assess a sex offender's risk of reoffending were scientific evidence, 296 Kan. at 378; and that "the actuarial risk assessments pass *Frye* scrutiny." 296 Kan. at 379.

Pointedly, *Girard* did not mention the 2011 amendments to K.S.A. 59-29a06 or indicate that, going forward, there would be a statutory constraint on applying the general test for admitting scientific evidence from expert witnesses in a SVPA action. In changing the general test in this state from the *Frye* test to the *Daubert* test, the Legislature did not specify that it was inapplicable in a SVPA action. Moreover, given that the State did not cross-appeal the district court's determination that the *Daubert* test applied and that the parties do not provide any argument as to why this court should not follow *Girard*'s tack, we will proceed by presuming that the *Daubert* test applies to the admissibility of the challenged actuarial tests in this SVPA action.

In *Daubert*, the Supreme Court recognized that the *Frye* test had been superseded by the adoption of the Federal Rules of Evidence. 509 U.S. at 587. However, the Court noted that this did not remove all qualifications for admissibility of scientific evidence; rather, the trial judge has a gatekeeping obligation to ensure that scientific evidence is relevant and scientifically reliable. 509 U.S. at 589. To that end, *Daubert* provided a list of nonexclusive factors a trial judge could use to fulfill this gatekeeping requirement: whether the theory or technique can and has been tested; whether it has been subject to peer review; the rate of error; the existence and maintenance of standards; and whether the theory or technique has general acceptance among the relevant scientific community. 509 U.S. at 592-94. *Daubert* emphasized that these factors were not exclusive and that the trial court's overarching inquiry should be the scientific validity, evidentiary relevance, and reliability of the evidence. 509 U.S. at 593-95; see also *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147, 149-50, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999) (trial

8

judge's gatekeeping function applies to all expert testimony, not just scientific testimony, and a court may consider the *Daubert* factors when deciding admissibility).

Cone does not challenge the qualifications of the State's experts, and so our inquiry is focused entirely on a determination of reliability. Although the factors provided in *Daubert* are nonexclusive, Cone does not argue that any additional factors should be considered in weighing the admissibility of the actuarial tests, other than to point to the concerns expressed by the Court of Appeals, i.e., the differences in percentages generated by the two tests and the tests' failure to account for offender treatment. Primarily relying on the testimony of his expert, Cone challenges the panel's analysis of each of the *Daubert* factors. We will consider Cone's arguments on each factor, but ultimately we reach the same conclusion as the panel.

*Whether the theory can be (and has been) tested*

In *Daubert*, the Supreme Court stated the following with regard to this factor:

"'Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry.' Green[, Expert Witnesses and Sufficiency of Evidence in Toxic Substances Litigation:  The Legacy of *Agent Orange* and Bendectin Litigation, 86 Nw. U. L. Rev. 643,] 645 [1992]. See also C. Hempel, Philosophy of Natural Science 49 (1966) ('[T]he statements constituting a scientific explanation must be capable of empirical test'); K. Popper, Conjectures and Refutations:  The Growth of Scientific Knowledge 37 (5th ed. 1989) ('[T]he criterion of the scientific status of a theory is its falsifiability, or refutability, or testability') (emphasis deleted)." 509 U.S. at 593.

Cone argues that the reliability of Static-99R and Static-2002R cannot be tested because:  (1) the experience of the person administering the test can impact the results;

9

(2) the tests underestimate recidivism rates but do not quantify the percentage of underestimation; and (3) the developers of the Static instruments have not released the initial raw data used to develop those instruments. Those arguments are not persuasive.

The State presented evidence that the Static-99R has been subject to two categories of testing:  how reliably people can score the test; and how reliably the test predicts future sexual offending. The State also presented evidence that the Static-2002R has been tested, as well as evidence that using the tests in tandem has been tested.

Cone's first point—that the experience of the person administering the test can affect the results—actually refutes his argument. The only reason researchers know this is because the Static instruments have, in fact, been tested.

Second, Cone asserts that the tests underestimate recidivism rates but cannot quantify by what percentage. In response to a question about the average rates of recidivism provided by the assessments, Dr. Grimmell said that average rates are the rates that someone will reoffend and be reconvicted. He explained that there are many reoffenses that are not detected, which has "been studied and we have estimates of how large that affect is." The State presented evidence of dozens of tests in which the Static instruments have been re-verified by tracking sex offenders over time to measure recidivism rates—one such study followed more than 7,000 sex offenders to determine the accuracy of both the Static-99R and Static-2002R tests. In short, Cone's argument is unavailing.

Similarly, Cone's argument regarding the lack of access to the raw data used to develop the Static tests fails in the light of the repeated re-verifications of the tests over the years. Dr. Grimmell testified that the raw data is not commonly used in this field, and that those numbers were not necessary to verify the accuracy and results of the Static

10

tests. The Static instruments have been repeatedly tested, verified, and updated; the absence of the initial raw data did not impede the testing. In summary, the Static tests have been subject to testing and therefore satisfy this *Daubert* factor.

*Whether the theory or technique has been subject to peer review and publication*

The *Daubert* Court said that scrutiny by the scientific community is a pertinent component of good science because it increases the likelihood that flawed methodology will be detected. 509 U.S. at 593. As noted, the Static-99R and Static-2002R have been subject to numerous reviews and tests. Dr. Grimmell testified that these instruments have been tested at least 42 times regarding how well they predict reoffending. As noted, another study followed over 7,000 offenders to determine whether the tests' predicted rates of reoffending were accurate. More than 100 articles have been published in peer review journals on the subject. This *Daubert* factor is satisfied.

*Known or potential rate of error*

Cone argues that the Static tests are unreliable because they have an unknown rate of error. Cone's expert, Dr. Barnett, challenged the tests on this basis.

But the district court found Dr. Grimmell's testimony on behalf of the State more persuasive. Dr. Grimmell said the Static-99R error rate was developed using something called the area under the curve (AUC) concept. The AUC concept means "in a field where you have less than total knowledge, how accurate are you, and since we're predicting the future, we will always have less knowledge in total." The Static-99R's AUC is .72. This means there is a 72% chance that a randomly selected recidivist will have a higher score on the instrument than a randomly selected nonrecidivist. The Static-2002R has a slight advantage over the Static-99R, with an AUC of .75.

11

The State also presented expert testimony regarding the intraclass coefficient, which measures how consistently the tests can be administered by an experienced examiner. The Static-99R's intraclass coefficient was .85 on a scale of 0 to 1, which is considered "bordering on excellent." The Static-2002R had a slightly better scoring prediction.

Cone is correct that Dr. Grimmell candidly admitted that the 72% statistic cannot be applied to a single case because in a single case, the prediction will either be right or wrong. But Cone overlooks other testimony from Dr. Grimmell explaining that the Static assessments are "not meant to be the be-all and end-all." Instead, the probability gives the assessor "a starting point risk range." The Static assessments are used in conjunction with individual evaluation including a clinical interview and the individual's historical data.

Cone's argument goes more to the credibility of the evidence than its admissibility. There is a quantifiable rate of error; it just is not measured in a manner that Cone might prefer. And just as the rate of error is but one factor in the overall analysis of the admissibility of the Static tests, the Static tests themselves are but one factor in the overall inquiry in the SVPA proceeding. This factor does not invalidate the tests.

*Existence and maintenance of standards controlling the technique's operation*

Dr. Grimmell testified that the standards for scoring the tests are set out in manuals with very detailed instruction on how to score the tests. Cone argues that the only manuals and standards available are those published on the internet by a group founded and directed by Karl Hanson, one of the creators of the Static assessment tools. But as the Court of Appeals stated, "[i]t makes sense that the persons who developed the

12

test would also include instructions on the technique's operation." *Cone*, 2017 WL 3668891, at *5. On this factor, Cone's argument simply lacks merit.

*General acceptance within the relevant scientific community*

Under the *Frye* standard, general acceptance within the scientific community was the primary inquiry. *Daubert* did not remove the general acceptance inquiry, but rather demoted it to simply one factor to be considered in the overall analysis. *Girard*, 296 Kan. at 379. Indeed, in *Girard* we explicitly held that the predecessor to the Static-99R assessment tool satisfied the general acceptance inquiry. 296 Kan. at 377-79.

Cone concedes that the tests are widely accepted. All of the experts, including Cone's expert, testified to that effect. Granted, Dr. Barnett opined that the tests are controversial and warned that just because something is accepted does not mean it is valid. Nevertheless, given the testimony from all experts in this case regarding the tests' widespread acceptance, this factor is satisfied.

*Additional factors/concerns*

The Court of Appeals discussed "a couple concerning aspects about the tests." *Cone*, 2017 WL 3668891, at *6. First, the panel noted that the two tests generated different results for Cone's percentage risk of reoffending—one score on the Static-99R predicted an 18 to 23 percent risk of reoffending, while the Static-2002R resulted in a 29 to 40 percent risk. But the panel pointed out that, although the results may initially appear to be disparate, the scores fall within the same categories, i.e., moderate to high risk.

Next, the panel discussed the fact that the tests fail to account for offender treatment—meaning that offenders who successfully complete treatment will likely have

the same score after treatment as they had before. Nevertheless, as Dr. Grimmell testified, the tests are but one tool used in the overall evaluation of an offender. Likewise, as the panel noted, *Daubert* contemplated that even admissible expert testimony could be subjected to "'[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" 2017 WL 3668891, at *6 (quoting *Daubert*, 509 U.S. at 596).

*Conclusion*

The panel ultimately concluded "that the district court did not abuse its discretion in admitting the actuarial tests." 2017 WL 3668891, at *6. We agree. The district court considered conflicting expert testimony on the reliability of the Static tests and found that they were admissible. In performing its gatekeeping function, the district court did not abuse its discretion.

SUFFICIENCY OF THE EVIDENCE

In order to prove that a person is a sexually violent predator, the State must show:

"(1) the individual has been convicted of or charged with a sexually violent offense, (2) the individual suffers from a mental abnormality or personality disorder, (3) the individual is likely to commit repeat acts of sexual violence because of a mental abnormality or personality disorder, and (4) the individual has serious difficulty controlling his or her dangerous behavior." *In re Care & Treatment of Williams*, 292 Kan. 96, 106, 253 P.3d 327 (2011) (citing K.S.A. 2010 Supp. 59-29a02[a]; *Kansas v. Crane*, 534 U.S. 407, 413, 122 S. Ct. 867, 151 L. Ed. 2d 856 [2002]; PIK Civ. 4th 130.20).

14

Cone concedes that he was convicted of a sexually violent offense but argues generally that the evidence was insufficient to establish the other elements. In his petition for review, Cone specifically "argues that the evidence was not sufficient to diagnose him as having Pedophilia, and thus commit him under the SVPA."

*Standard of review*

When reviewing the sufficiency of the evidence in a sexually violent predator determination proceeding, the court views the evidence in the light most favorable to the State, and must be convinced that a reasonable fact-finder could have found that the State met its burden to demonstrate beyond a reasonable doubt that the person is a sexually violent predator. *Williams*, 292 Kan. at 104.

*Analysis*

The SVPA defines "mental abnormality" as "a congenital or acquired condition affecting the emotional or volitional capacity which predisposes the person to commit sexually violent offenses in a degree constituting such person a menace to the health and safety of others." K.S.A. 2017 Supp. 59-29a02(b). The SVPA does not define "personality disorder." In that regard, both parties rely on the Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) (DSM-5).

Dr. Crane and Dr. Johnson both testified that Cone met the diagnostic criteria for pedophilic disorder under the DSM-5. The DSM-5 provides the following diagnostic criteria for pedophilic disorder:

15

"A. Over a period of at least 6 months, recurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with a prepubescent child or children (generally age 13 years or younger).

"B. The individual has acted on these sexual urges, or the sexual urges or fantasies cause marked distress or interpersonal difficulty.

"C. The individual is at least age 16 years and at least 5 years older than the child or children in Criterion A." DSM-5, § 302.2, p. 697.

Cone does not contend that pedophilic disorder is insufficient to satisfy the mental abnormality or personality disorder element of a sexually violent predator. Rather, he argues that there is insufficient evidence to support the doctors' diagnoses of pedophilic disorder. For instance, he denies admitting to Dr. Crane that he had experienced the requisite fantasies, so he asserts that she was not permitted to infer from his behavior that he had such fantasies.

But the DSM-5 "Diagnostic Features" section on pedophilic disorder provides: "The diagnostic criteria for pedophilic disorder are intended to apply both to individuals who freely disclose this paraphilia and to individuals who deny any sexual attraction to prepubertal children . . . despite substantial objective evidence to the contrary." DSM-5, § 302.2, p. 698. Therefore, Dr. Crane was not required to have a statement from Cone that he had sexual fantasies about prepubertal children in order to render her diagnosis.

Moreover, both of the State's experts, Dr. Crane and Dr. Johnson, evaluated Cone and opined that his statements denying that he no longer had fantasies about children were not credible. This was based not only on their observations of Cone but also their review of Cone's statements and behavior at the time of his 2012 arrest, and the statements and records about Cone's past behaviors.

16

Granted, Cone's expert, Dr. Barnett, countered that he had seen no evidence of Cone having the requisite fantasies and urges within the previous six months, which he opined was crucial. Dr. Barnett also noted other factors outside of the DSM-5 that contradicted a diagnosis of pedophilic disorder, such as Cone's lack of a compulsive interest in children, the fact that he had not actively sought work or recreational opportunities in places frequented by children, and the fact that he did not collect child pornography.

But it is not our function to assess the credibility of the experts' competing testimony when assessing the sufficiency of the evidence. *Williams*, 292 Kan. at 104. The jury, which has the responsibility to assess credibility and weigh competing evidence, heard the testimony of Doctors Crane, Johnson, and Barnett and made its decision. The evidence was sufficient for the jury to believe the diagnosis of pedophilic disorder.

Cone also challenges the sufficiency of the evidence to support Dr. Johnson's additional diagnosis of antisocial personality disorder. But then Cone argues that, if the pedophilia diagnosis is invalid, the antisocial personality disorder would not satisfy the mental abnormality or personality disorder element of a sexually violent predator. Perhaps, then, our finding that the pedophilic disorder diagnosis was supported by substantial competent evidence renders moot Cone's challenge to the antisocial personality disorder diagnosis. Nevertheless, without reweighing the evidence or reassessing witness credibility and viewing the evidence in the light most favorable to the State, we would hold that the evidence was sufficient for that diagnosis.

Cone makes a cursory argument on the sufficiency of the evidence to support the elements that he was likely to commit repeat acts of sexual violence and that he has serious difficulty controlling his dangerous behavior. Essentially, he recites the evidence

he presented that was favorable to him, urging us to accept that evidence as refuting the expert testimony of Dr. Crane and Dr. Johnson. Again, the fact that Cone put on evidence to refute the State's evidence does not render the State's evidence insufficient. The State's evidence, if believed by the jury, was sufficient to support its verdict that Cone is a sexually violent predator under the SVPA.

CONCLUSION

In summary, we hold that on the record before us the district court did not err in admitting the results of the Static-99R test and Static-2002R test as meeting the reliability standard under *Daubert*, as codified in K.S.A. 2017 Supp. 60-456(b). Further, the State presented sufficient evidence to support the jury's verdict that Cone is a sexually violent predator under the SVPA.

Affirmed.

18