NOT DESIGNATED FOR PUBLICATION

No. 122,532

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

ROY L. BOWENS,
*Appellant*,

v.

GREENWOOD COUNTY HOSPITAL, NANCY MCKENZIE, PA,
PETIE SCHWERDTFEGER, MD, and JANIS ANDERSON, ARNP,
*Appellees*.

MEMORANDUM OPINION

Appeal from Greenwood District Court; MICHAEL E. WARD, judge. Opinion filed July 16, 2021. Affirmed.

*Jerry K. Levy* and *Katherine L. Kirk*, of Law Offices of Jerry K. Levy, P.A., of Lawrence, for appellant.

*Peter G. Collins*, of Hinkle Law Firm, LLC, of Lenexa, for appellees Greenwood County Hospital and Nancy McKenzie, PA.

*Diane L. Waters*, of Bennett, Bodine & Waters, P.A., of Shawnee, for appellee Petie Schwerdtfeger, MD.

*Matthew P. Sorochty* and *Anthony M. Singer*, of Woodard, Hernandez, Roth & Day, L.L.C., of Wichita, for appellee Janis Anderson, ARNP.

Before GREEN, P.J., SCHROEDER, J., and WALKER, S.J.

1

PER CURIAM:  Roy L. Bowens sued Greenwood County Hospital, Petie Schwerdtfeger, MD., Nancy McKenzie, PA, and Janis Anderson, ARNP (defendants) for negligence. Bowens alleged negligent treatment over the course of several days for a gangrenous infection which worsened by the hour. Defendants moved for summary judgment, arguing that Bowens failed to meet his burden to show how much tissue damage, if any, defendants caused. Because the trial court properly awarded summary judgment for lack of causation evidence, we affirm.

FACTS

*Bowens' care and treatment*

On January 18, 2016, at 1:21 a.m., Bowens went to the emergency room (ER) complaining of pain in his perineal/groin area. His vital signs included elevated blood pressure, elevated heart rate, and fever. He rated his pain as 10 out of 10. The treating registered nurse (RN) found a one-quarter centimeter open area at the left perineal area just below the scrotal sac. Then, defendant Janis Anderson, ARNP, examined Bowens.

An advanced registered nurse practitioner (ARNP) is a licensed independent practitioner who provides primary and/or specialty nursing and medical care in ambulatory, acute, and long-term settings. The process of care of an ARNP includes assessment of health status, diagnosis, development of a treatment plan, implementation of the plan, and follow up and evaluation of the patient status.

Anderson examined Bowens and found the abscess that the RN described, an opening one-quarter centimeter in diameter. Anderson's clinical impression or diagnosis was "'small cellulitis abscess left perineal area.'" After giving Bowens an intravenous (IV) antibiotic, Anderson prescribed Bactrim, a broad-spectrum antibiotic. Anderson discharged Bowens, instructing him to follow up as needed.

On the morning of January 20, 2016, Bowens went to see Dr. Mark Basham because Bowens was not getting any better. Dr. Basham advised Bowens to go to the ER for evaluation.

Later that day, Bowens went to the Greenwood County Hospital ER. An RN charted that Bowens had a draining abscess at the base of his left scrotum and was having fever and chills at home. A blood count showed his white blood cell count was 20,140, not the 12,100 when he was in the ER on January 18, 2016.

Nancy McKenzie, P.A. examined Bowens on January 20, 2016. McKenzie noted that Bowens had a draining abscess at the base of his scrotum and experienced fevers and chills. McKenzie cleaned the wound area, obtained cultures, and prescribed morphine and an antibiotic. McKenzie's diagnosis was scrotal abscess, fever, leukocytosis, and failed outpatient treatment. McKenzie admitted Bowens as an inpatient to Greenwood County Hospital at 3:05 p.m. on January 20.

From 4:15 p.m. on January 20 through 3:23 p.m. on January 22, several treating RNs documented Bowens' condition becoming worse. Bowens' condition was Fournier's gangrene, a bacterial infection that eats the flesh, in lay terms. This necrotizing fasciitis of the perineal, genital, or perianal areas affects mostly men. The fasciitis goes along the deep fascial planes and is not always obvious to the superficial skin. Initially, the appearance of the skin may mask the extent of any subdermal gangrene and this may lead to a delay in any diagnosis being reached.

The notes from the treating RNs show the progression of Bowens' condition. At 5:01 p.m. on January 20, Bowens was "admitted to the floor with abscess in his scrotum. It is too sensitive to touch at this time." At 5:40 p.m., an RN "injected 5 mg iv MS for having sharp and throbbing pain in his private area." At 5:58 p.m., the same RN "[n]oted even hardness on suprapubic area and groins and upper thighs from the abscess." At

3

6:35 p.m., the same RN "[n]oted a very tiny opening on LT side of scrotum, and [squeezed] some pus out and cleaned up . . . . It's very offensive smell." At 11:48 p.m., "pt complained of burning in groin area . . . some foul smelling drainage grey brown in color."

On January 21, 2016, at 9:29 a.m., an RN "[squeezed] his scrotum and dark pinkish pus coming out. Noted new opening on the top of the penis. The hardness has gone in thighs but he [is] still having the hardness on the penis and scrotum and pubic area."

Dr. Schwerdtfeger saw and treated Bowens at approximately 11:00 a.m. on January 21, 2016. At 4:32 p.m., an RN "[c]leaned his private area again. Noticed that skin on the penis is peeling." At 9:30 p.m., an RN reported that Bowens "[c]ontinues to have green-brown drainage from perineal wound. Very foul smell from perineal area. Noted open skin areas at base of penis." At 11:46 p.m., the treating RN reported the following: "Unsure source of foul odor. I had this gentleman's care in the ER on Sunday and at this time unable to see the wound opening at the L perineal area that was there then. Scrotal and penile edema noted. Very foul smell coming [from the] perineal area."

On January 22, 2016, at 6:45 a.m., the treating RN reported as follows:  "The 'skin sloughing' at base, anterior side of penis continues w/ brownish-tan colored drainage. Very foul smelling." At 8:12 a.m., Bowens had "significant swelling to penis, scrotum and suprapubic region. There is [a] moderate amount of sloughing skin from penis and scrotum. There is a large area of necrotic skin noted to anterior portion of penis at the shaft. This area is [approximately] 1/2 dollar size. There is a very foul odor that has overcome the entire room. . . . Lab reports WBC 16.21 this [morning]."

4

When Bowens insisted, Dr. Schwerdtfeger ordered him transferred to Via Christi St. Francis (Via Christi) on January 22, 2016, where he was diagnosed with Fournier's gangrene. Bowens underwent surgical debridement on January 23, 2016.

In an operative report on January 23, 2016, one surgeon recorded the following: "He had extensive injury to about 50% of his left hemiscrotum. He had significant necrosis of the skin and almost the entire dorsum of his penis. The shaft skin was involved and necrotic." Another operative report stated the following: "Approximate area of debridement 12 x 7 x 3 cm from the left hemiscrotum and groin, 8 cm x 4 cm from the penile shaft, 6 cm of undermined tissue from the left perineum, 6 cm of undermined tissue from the left proximal groin."

*Plaintiff's expert witness, Dr. David W. Fairbanks, M.D.*

Bowens filed a petition alleging negligence. Bowens designated expert witnesses Dr. Fairbanks and Colleen Andreoni, APRN. Dr. Fairbanks summarized defendants' care of Bowens as follows:

> "Mr. Bowen[s] had spread of tissue infection and death that resulted in protracted pain and disability that could have been avoided, because his condition was not recognized early nor treated appropriately. . . .
>
> "The causative effect of these three providers' and the staff at Greenwood County Hospital's failure to detect and treat early Mr. Bowen[s'] sepsis and Fournier's gangrene, was to place not only his standard of care, but his fate back in the 16th century. The great 20th and 21st century advances of superior antibiotics, early surgical debridement, diagnostic testing and the technology of hospitals are wasted if hospital staff fail to follow extensively published international evidence-based standards of care and their own hospital protocols and physicians do not advance their knowledge and skill when it is offered so close to home to prevent a tragic avoidable spread of infection and loss of vital tissue."

Defendants did not dispute Dr. Fairbanks' assertion that the spread of infected and necrotized tissue could have been avoided by early diagnosis and treatment. "Fournier's gangrene is an infection of the genital areas that rapidly spreads along the fascial planes of this area." The progression of Fournier's gangrene can be very rapid and can include many different symptoms.

During depositions, Dr. Fairbanks testified that Fournier's gangrene is a surgical emergency that requires immediate surgical intervention. He testified that Bowens already had Fournier's gangrene before he went to the Greenwood County Hospital ER the first time, on January 18, 2016. Dr. Fairbanks testified that when Bowens went to the ER on January 18, 2016, he already needed surgical debridement, antibiotics, fluids, and inpatient care. According to Dr. Fairbanks, antibiotic treatment alone would not treat Fournier's gangrene.

Dr. Fairbanks testified that if Dr. Schwerdtfeger had come in on January 21, 2016, at approximately 11:00 a.m., assessed Bowens, had concern for Fournier's gangrene, and immediately arranged for transfer to Via Christi, then she would have met the standard of care.

Dr. Fairbanks asserted that delays in the diagnosis and treatment caused injury in the form of additional tissue loss. But Dr. Fairbanks could not quantify the degree of tissue lost because Dr. Schwerdtfeger did not transfer Bowens to Via Christi immediately. Dr. Fairbanks also could not say how much additional tissue loss occurred because of delays attributed to all defendants. Instead, he testified that such estimations of additional tissue loss were outside the scope of his expert report and those estimations were for a surgeon to comment on.

Dr. Fairbanks could not specify any injury or damage to Bowens. When asked to comment on the extent of tissue removed, Dr. Fairbanks could not say how much tissue

6

Bowens could have retained if he had surgery sooner. Dr. Fairbanks explained the following:

"[T]his is a time-dependent infection, and things spread. So logically the sooner you catch it—and that's why all of the documentation says it's a surgical emergency. The sooner we catch it, the less tissue is lost.

"So can I quantify and say 51 percent less? No, I can't do that. Okay? But I can say definitively that he would have had less loss of tissue based on the fact there was 24 hours of delay."

*Plaintiff's expert witness, Colleen Andreoni, APRN*

Andreoni's expert report included a statement that Anderson deviated from the standard of care in how she administered and prescribed antibiotics. After one dose of an IV antibiotic, Anderson prescribed only Bactrim. Andreoni's report stated that "[t]hese deviations from the standard of care resulted in the spread of infection and delayed definitive treatment for Mr. Bowens' Fournier's gangrene resulting in prolonged pain, hospitalization, and recovery process." At her deposition, Andreoni testified that "the infection most likely spread due to a deviation from the standard of care."

But Andreoni also testified that Anderson treated Bowens appropriately if Fournier's gangrene was present. Further, Andreoni had no criticisms of Anderson's antibiotic treatment, stating that "I think the Ceftriaxone she gave was a good antibiotic." In addition, the blood culture tests taken on January 20, 2016, indicated that the antibiotics Anderson prescribed were preventing the infection from spreading to the blood, that is, preventing sepsis. Andreoni had no opinion on how any delay in diagnosis affected Bowens' treatment or outcome. Andreoni testified that Bowens could not have avoided debridement surgery with an earlier diagnosis. She had no opinions on how the infection spread from Bowens' first ER visit on January 18 going forward. Andreoni

could not say with a reasonable degree of medical certainty that the deficiencies in treatment she noted had any effect on the outcome of Bowens' treatment.

Defendant Anderson moved to strike Andreoni's causation opinion, asserting that Andreoni was not qualified to give causation opinions. The trial court granted the motion, finding that causation was beyond the scope of Andreoni's qualifications.

*Procedural history and notice of appeal*

Defendants each moved for summary judgment, arguing that Bowens could not meet his burden on causation. After a hearing on the motions, the trial court decided the preliminary matter of whether Bowens could pursue a claim of loss of chance of a better recovery at trial. The trial court stated the following:

> "Beyond absence of pleading the loss of chance claim is the lack of expert medical testimony to support such claim. Such expert testimony could be in the form of a definitive percentage of loss of chance. Or it could be in the form of a range of percentage of loss of chance. Either way there must be expert medical testimony to guide a jury's determination that plaintiff lost his chance for a better recovery. As defendants point out, plaintiff expert David Fairbanks, M.D. was not able to state in his deposition testimony how much additional tissue loss the plaintiff suffered due to the conduct of various defendants. Accordingly, there is no expert medical witness support for a loss of chance claim. It would not be proper for this Court to allow the jury to come up with its own percentage based simply upon a layman's review of the medical records."

After that ruling, the trial court granted summary judgment for all defendants.

Bowens moved the trial court to reconsider summary judgment. The trial court denied the motion because it provided the court with no new information or grounds or legal authority on which to base an amended decision.

8

Bowens timely appealed the following trial court order: "Order Denying Plaintiff's Motion for Reconsideration of the Order granting defendant's motion for summary judgment, which was entered on January 7, 2020, to the Court of Appeals of the State of Kansas." Bowens did not list any other orders in his notice of appeal.

Bowens filed a "Motion to Amend and Clarify Notice of Appeal" with this court, which this court granted. Bowens sought to "make clear the intent of the appellant that his appeal is being taken from both orders issued by the trial court—the order granting Defendants' motions for summary judgment and the final order denying the plaintiff's motion for reconsideration." In granting Bowens' motion, this court acknowledged that the amended notice of appeal raised jurisdiction concerns and ordered the parties to brief jurisdiction.

ANALYSIS

*Does this court have jurisdiction over all issues raised by Bowens?*

Defendants argue that Bowens' notice of appeal was not broad enough to cover the issues which he argues in his appellate brief. Bowens contends that his appeal from the trial court's order on a motion to reconsider summary judgment also gives this court jurisdiction over the summary judgment itself. Because the order on the motion to reconsider referenced the issues now on appeal, the notice of appeal in this case was sufficient to confer jurisdiction on this court to decide those issues.

Subject matter jurisdiction may be raised at any time, whether for the first time on appeal or even on the appellate court's own motion. Whether jurisdiction exists is a question of law over which this court's scope of review is unlimited. *In re Care & Treatment of Emerson*, 306 Kan. 30, 33-34, 392 P.3d 82 (2017).

The right to appeal is entirely statutory and is not contained in the United States or Kansas Constitutions. *Wiechman v. Huddleston*, 304 Kan. 80, Syl. ¶ 1, 370 P.3d 1194 (2016).

> "Appellate jurisdiction is defined by statute; the right to appeal is neither a vested nor a constitutional right. The only reference in the Kansas Constitution to appellate jurisdiction demonstrates this principle, stating the Kansas Supreme Court shall have 'such appellate jurisdiction as may be provided by law.' Kan. Const., art. 3, § 3. Under this provision, this court may exercise jurisdiction only under circumstances allowed by statute; this court does not have discretionary power to entertain appeals from all district court orders. [Citations omitted.]" *Kansas Medical Mut. Ins. Co. v. Svaty*, 291 Kan. 597, 609-10, 244 P.3d 642 (2010).

See *State v. Gill*, 287 Kan. 289, 293-94, 196 P.3d 369 (2008).

A notice of appeal must specify the parties taking appeal, designate the judgment or part of the judgment appealed from, and name the appellate court to which the appeal is taken. K.S.A. 2020 Supp. 60-2103(b). "'It is a fundamental proposition of Kansas appellate procedure that an appellate court only obtains jurisdiction over the rulings identified in the notice of appeal.'" *Associated Wholesale Grocers, Inc. v. Americold Corporation*, 293 Kan. 633, 637, 270 P.3d 1074 (2011); *In re N.U.*, 52 Kan. App. 2d 561, 567, 369 P.3d 984 (2016). An appellate court should not be overly technical in its construction of notices of appeal. *Fuller v. State*, 303 Kan. 478, 492, 363 P.3d 373 (2015).

Here, Bowens' notice of appeal sought review only of "the Order Denying Plaintiff's Motion for Reconsideration of the Order granting defendant[s'] motion for summary judgment, which was entered on January 7, 2020." "Utilization of 'catch-all' language, such as 'and from each and every order or ruling entered against the appellant' or 'from all underlying adverse rulings' in a notice of appeal had been recognized as

sufficiently inclusive to perfect appeals from otherwise unspecified rulings." *Gates v. Goodyear*, 37 Kan. App. 2d 623, 627-28, 155 P.3d 1196 (2007). Bowens did not include catch-all language.

Nevertheless, our Supreme Court's guidance in *Fuller* shows that the content of the order appealed from makes a difference. Raymond Fuller filed a K.S.A. 60-1507 motion alleging ineffective assistance of counsel at his trial for rape, aggravated sexual battery, and aggravated battery. In a November 2011 order, the trial court ruled that Fuller's counsel was not ineffective for failing to put on a particular witness. Fuller did not appeal this order. Then, in June 2012, the trial court denied Fuller's K.S.A. 60-1507 motion. Fuller's notice of appeal specified only the June 2012 order, without any catch-all language or other reference to the November 2011 order deciding the failure to call a witness issue. On appeal, this court believed the specific language in Fuller's notice of appeal would have to be "'substantively rewritten'" to give this court jurisdiction over the witness issue. 303 Kan. at 492.

Our Supreme Court disagreed. The notice of appeal explicitly covered the June 2012 order and that order referenced the earlier decisions of the trial court. The *Fuller* court pointed to paragraph 3 of the trial court's order, which read as follows: "'On September 30, 2011, a preliminary, nonevidentiary hearing was held and this court summarily denied movant relief on his assertion of cumulative error and *several assertions of ineffective assistance of trial counsel*. See Order Granting Movant a Limited Evidentiary Hear[]ing on His K.S.A. 60-1507 Motion.'" (Emphasis added.) 303 Kan. at 492-93. The *Fuller* court ruled that the appellate courts had jurisdiction to decide the witness issue because Fuller appealed the June 2012 order and the June 2012 order referenced the witness issue.

Here, the content of the trial court's order also controls the issues appealed. One reason the trial court gave for denying the motion to reconsider was simply that its

11

decision was correct, stating the following: "A second look at the same material has not altered this Court's view that summary judgment was appropriate." This reference to a previous ruling is stronger than the reference in *Fuller*. In *Fuller*, the trial court referenced only "several assertions of ineffective assistance" without specifying the issue of whether counsel should have called a particular witness. 303 Kan. at 493. Here, the court's reasoning on the motion to reconsider hinged on the correctness of its previous summary judgment decision. The trial court similarly discussed expert witness causation testimony in the same order, making a notice of appeal from that order sufficient to confer jurisdiction to decide the expert witness issues as well.

Further, as a practical matter, the issues involved here are significantly interlinked and possibly inseparable. All defendants cite *State v. Grant*, 19 Kan. App. 2d 686, 875 P.2d 986, in their briefs, but *Grant* undermines their jurisdiction arguments because *Grant* is very dissimilar from this case. In *Grant*, the appellant filed a notice that he was appealing the trial court's denial of his motion to modify sentence. Grant later attempted to add the issues of whether the trial court properly imposed a prison sentence and whether the factual basis was sufficient to support his guilty plea. This court only considered the modification of sentence issue and dismissed the two issues which were not in the original notice of appeal, that is, the imposition of sentence and the guilty plea. 19 Kan. App. 2d at 691-92. But those issues were separate and distinct from the modification of sentence issue. Indeed, whether a court should have modified a sentence is a different question from if the court correctly imposed the sentence in the first place. And if a guilty plea was properly entered is entirely different from the other two issues. Thus, the defendants' reliance on the *Grant* decision is misplaced.

Here, though, the sequential nature of the rulings cannot be ignored. First, the trial court struck one expert witness' causation testimony. Then, the trial court ruled that Bowens could not meet his burden on causation and granted summary judgment to defendants. Finally, the trial court denied reconsideration, saying that summary judgment

was appropriate. Given the Russian nesting doll structure of these issues, this court would need to consider each ruling to meaningfully review the trial court's denial of the motion to reconsider.

*Did the trial court err in granting summary judgment?*

Bowens argues that the trial court did not properly evaluate Dr. Fairbanks' testimony on causation before granting summary judgment. He contends that the trial court combined two separate issues: whether injury occurred because of negligence and how much injury occurred because of negligence. Defendants assert that tissue loss had two possible causes: the natural disease process of Fournier's gangrene or the allegedly negligent delay in treatment. Defendants argue that Bowens cannot establish which tissue was lost from each cause. Because the expert witness testimony could not establish causation, the trial court properly granted summary judgment.

> "Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, admissions on file, and supporting affidavits show that no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. The district court must resolve all facts and reasonable inferences drawn from the evidence in favor of the party against whom the ruling [is] sought. When opposing summary judgment, a party must produce evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issue in the case. Appellate courts apply the same rules and, where they find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment is inappropriate. Appellate review of the legal effect of undisputed facts is de novo. [Citation omitted.]" *GFTLenexa, LLC v. City of Lenexa*, 310 Kan. 976, 981-82, 453 P.3d 304 (2019).

Summary judgment in a negligence action is generally proper if the only questions presented are questions of law. See *Manley v. Hallbauer*, 308 Kan. 723, 726, 423 P.3d 480 (2018). "'[S]ummary judgment should be granted with caution in negligence

actions.'" *Hammond v. San Lo Leyte VFW #7515*, 311 Kan. 723, 727, 466 P.3d 886 (2020).

"A party cannot avoid summary judgment on the mere hope that something may develop later during discovery or at trial." Likewise, "[m]ere speculation is insufficient to avoid summary judgment." *Kincaid v. Dess*, 48 Kan. App. 2d 640, 656, 298 P.3d 358 (2013).

Here, the trial court ruled that Bowens had presented no evidence on causation. In its order, the trial court noted that Dr. Fairbanks testified that defendants' negligence caused harm to Bowens. But Dr. Fairbanks also testified that he could not specify the quantity of tissue lost because of defendants' negligence. The trial court ruled that Bowens could not support an essential element of his medical malpractice case and granted summary judgment for defendants.

The elements of a medical malpractice claim are: (1) the health care provider owed the patient a duty of care, which required that the provider meet or exceed a certain standard of care to protect the patient from injury; (2) the provider breached that duty or deviated from the applicable standard of care; and (3) the patient was injured; and (4) the injury proximately resulted from the health care provider's breach of the standard of care. *Biglow v. Eidenberg*, 308 Kan. 873, 887, 424 P.3d 515 (2018).

The trial court ruled that Bowens presented no evidence on the fourth element, causation, and granted summary judgment. "'Negligence is never presumed, and may not be inferred merely from a lack of success or an adverse result from treatment. The plaintiff in a medical malpractice case bears the burden of showing not only the doctor's negligence, but that the negligence caused the injury.' [Citations omitted.]" *Hare v. Wendler*, 263 Kan. 434, 440, 949 P.2d 1141 (1997). "Generally, expert testimony is required to establish the appropriate standard of care and causation because such matters

are outside the knowledge of the average person without specialized training." *Perkins v. Susan B. Allen Memorial Hospital*, 36 Kan. App. 2d 885, 888, 146 P.3d 1102 (2006). The trial court ruled that Dr. Fairbanks' expert testimony did not establish the causal link that Bowens needed to survive summary judgment. In its summary judgment order, the trial court selected the following testimony from Dr. Fairbanks' depositions:

"Q.  What's the injury, the loss of tissue?

"A.  Correct.

"Q.  Okay. How much additional tissue did he lose that he wouldn't have already lost as of January 18th?

"A.  And you would have to refer to the surgeon's report, and that's outside the scope of my report.

"Q.  So you are not able to say here today how much additional tissue loss there was, based on the alleged delays that you've attributed to the defendants; is that correct?

"A.  Correct.

"Q.  And it's your belief that had those things been done (immediate surgery, transfer to different hospital, ultrasound, CAT scan), then there would have been some tissue saved with regard to the surgical debridement that was later done at Via Christi St. Francis?

"A.  That's what I've said.

"Q.  But you are unable to tell us how much tissue would have been saved?

"A.  Well, I think based on the spread of the superficial infection, it certainly may not have involved the penis. But it's hard to say because this infection spreads through the fascial planes and is not always obvious.

"Q.  So what I said is correct. You are unable to say to a reasonable degree of medical certainty—in fact, you've not even seen enough Via Christi records to be able to comment on it, right?

"A.  That's correct. I did see the operative report, but that's you know, for a surgeon to comment on.

"Q.  All right. And with respect that—we've already discussed this—but with respect to your opinions regarding the 20th, you believe that there may have been tissue spared if the surgery would have occurred earlier; but you cannot provide or quantify the amount of tissue that would have been spared; is that correct?

"A.   I believe I stated there would have been tissue spared, but I can't quantify.

"Q.   So are you able to say that the extent of Mr. Bowens' surgery at Via Christi St. Francis would have been any different had Dr. Petie [Schwerdtfeger] transferred Mr. Bowens on the 21st?

"A.   Well, this is a time-dependent infection, and things spread. So logically the sooner you catch it—and that's why all of the documentation says it's a surgical emergency. The sooner we catch it, the less tissue is lost. So can I quantify and say 51 percent less? No, I can't do that. Okay? But I can say definitively that he would have had less loss of tissue based on the fact that there was 24 hours of delay.

"Q.   You are just not able to say the degree of less loss of tissue?

"A.   Correct."

According to Dr. Fairbanks, the various defendants at various points failed to identify Fournier's gangrene. Each delay in diagnosis and treatment allowed the gangrene to spread and necrotize additional tissue. But Dr. Fairbanks could not estimate what tissue loss was caused by delay, whether the delay is attributable to any one defendant or to all of them.

Importantly, the trial court ruled first on Bowens' request to pursue a loss of chance of recovery before the court ruled on the motion for summary judgment. The trial court noted that our Supreme Court first recognized a cause of action for the loss of chance of a better recovery in *Delaney v. Cade*, 255 Kan. 199, Syl. ¶ 3, 873 P.2d 175 (1994):  "The loss of chance cause of action, although grounded in negligence, relies upon a lesser or reduced standard of causation than the traditional standard applied in negligence cases."

The *Delaney* court noted that Kansas already recognized loss of chance of survival actions when the patient dies.

"The loss of chance theory arises in medical malpractice cases wherein the patient is suffering a preexisting injury or illness which is aggravated by the alleged

16

negligence of the doctor or health care provider to the extent that the patient dies, when without negligence there might have been a substantial chance of survival or the actual recovery is substantially less than it might have been absent the alleged malpractice. In essence, the theory comes into play when the traditional probability standard of causation is not met." 255 Kan. at 203.

The *Delaney* court surveyed other jurisdictions, remarking that some recognized actions for loss of chance of survival and for loss of chance of a better recovery, but some jurisdictions did not recognize either claim. The *Delaney* court stated:  "[W]e have found no jurisdiction which has applied the theory to one type of case and denied it in the other." 255 Kan. at 209. The *Delaney* court then recognized both causes of action. 255 Kan. at 211.

In its survey of other jurisdictions, the *Delaney* court gave the example of *Borgren v. United States*, 716 F. Supp. 1378 (D. Kan. 1989). In *Borgren*, Army physicians had negligently failed to diagnose breast cancer, which led to a three-year delay in discovering and treating the cancer. Margaret Borgren underwent a modified radical mastectomy and then sued, alleging loss of chance of survival. Borgren produced expert witnesses who explained that a single cancer cell divides into two, two cells divide into four, etc. Thus, the "doubling time" for cancer growth is crucial as tumors grow exponentially. These experts estimated Borgren's doubling time between 80 and 210 days. 716 F. Supp. at 1381 (referencing chart correlating doubling time to size of tumor). The trial court determined from expert medical testimony that the delay resulted in Borgren's loss of between a 30 and 57 percent chance of survival for 10 years. The *Delaney* court found *Borgren* persuasive because the facts uniquely dealt with a patient who survived whereas the other cases cited involved the death of the patient. Further, Borgren was awarded damages for disfigurement, pain, suffering, and mental anguish in addition to the decreased chance of survival. This outcome led the *Delaney* court to conclude the following:  "In essence, *Borgren* is more akin to a loss of better recovery

17

case than to a loss of survival case even though the court referred to it as a loss of chance to survive." *Delaney*, 255 Kan. at 209.

But Bowens did not plead a loss of chance of recovery, even though his case is like *Borgren*. For example, Borgren lost breast tissue when she underwent a mastectomy because of a delay in diagnosing breast cancer. Similarly, Bowens lost skin tissue when he underwent a surgical debridement allegedly caused because of a delay in diagnosing Fournier's gangrene. As trial approached, Bowens asserted an intent to pursue a claim of loss of chance of recovery, but the trial court did not allow it. Bowens conceded that he did not plead a claim of loss of chance of recovery, but he argued that the claim was inherent to a standard medical malpractice case, and he did not need to plead it. In disagreeing with Bowens' position, the trial court ruled that a claim of loss of chance of recovery was a distinct action from a standard medical malpractice claim. Thus, the trial court ruled that it was too late for Bowens to amend his pleadings to bring this action. Bowens has not appealed from this ruling.

Then the trial court granted summary judgment in favor of the defendants for lack of evidence of a causal link between defendants' alleged negligence and injury or harm caused to Bowens. Expert testimony is generally required in medical malpractice cases to establish the applicable standard of care and to prove causation, except where lack of reasonable care or existence of proximate cause is apparent to an average layperson from common knowledge or experience. *Puckett v. Mt. Carmel Regional Med. Center*, 290 Kan. 406, 435-36, 228 P.3d 1048 (2010). So summary judgment is proper where there is no expert testimony in the record to show that the health care provider caused the injury. *Giddens v. Via Christi Regional Medical Center, Inc.*, No. 110,856, 2014 WL 6676154, at *4-5 (Kan. App. 2d 2014) (unpublished opinion).

In Dr. Fairbanks' deposition testimony, he testified that Fournier's gangrene was a surgical emergency that required immediate surgical debridement. Also, he testified that

18

Bowens already had Fournier's gangrene when he went to the Greenwood County Hospital ER on January 18, 2016. Thus, the damages Bowens may recover were those damages suffered by him due to the tissue loss incurred because of the delay in performing the debridement surgery.

Nevertheless, Dr. Fairbanks could not define the harm caused Bowens because he was unable to say how much tissue loss Bowens had suffered because of the delay in performing the debridement surgery. As a result, Dr. Fairbanks could not determine causation for any amount of tissue loss Bowens had suffered due to defendants' negligence. "Recovery may not be had where the cause of the injury is too remote and speculative and where the alleged resulting damages are too conjectural and speculative to form a sound basis for measurement." *Hoard v. Shawnee Mission Medical Center*, 233 Kan. 267, 277, 662 P.2d 1214 (1983). Dr. Fairbanks did not state, either in his report or in testimony, an amount of tissue loss that could be causally linked to any delays or to any single delay in Bowens' treatment. Thus, the trial court properly granted summary judgment in favor of defendants.

*Did the trial court err in striking causation testimony?*

Bowens argues that the trial court erred in striking Andreoni's causation testimony. The trial court ruled that the complex medical issues of causation were beyond the common knowledge of the average juror and Andreoni's qualifications.

Admission of evidence involves several legal considerations:  determining relevance, identifying and applying legal principles including rules of evidence, and weighing prejudice against probative value. See *Biglow*, 308 Kan. at 892.

19

An appellate court reviews the admission or exclusion of opinion testimony under K.S.A. 2020 Supp. 60-456 for an abuse of discretion. See *In re Care & Treatment of Cone*, 309 Kan. 321, 325, 435 P.3d 45 (2019).

Appellate review is de novo when the trial court's admission of expert testimony is based upon statutory interpretation. *Bullock v. BNSF Railway Co.*, 306 Kan. 916, 921, 399 P.3d 148 (2017).

In 2014, legislative amendments adopted the expert testimony standards of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589-94, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). See K.S.A. 2020 Supp. 60-456. Under the *Daubert* standard, the appellate court reviews de novo whether the trial court actually performed its gatekeeper role "and whether it applied the proper standard in admitting expert testimony." *Smart v. BNSF Railway Co.*, 52 Kan. App. 2d 486, 493, 369 P.3d 966 (2016). "*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999), teaches that *Daubert* is not talismanic; it simply means that before admitting expert testimony, the court must insure the testimony "'is not only relevant, but reliable.'" *Kumho Tire*, 526 U.S. at 147." *Smart*, 52 Kan. App. 2d at 493.

Appellate courts review the trial court's performance of its gatekeeper role in its decision to admit or exclude the testimony for abuse of discretion. See *In re Care & Treatment of Cone*, 309 Kan. at 332.

A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *Biglow*, 308 Kan. at 893.

Bowens retained Andreoni as an expert witness. Andreoni is an APRN and a doctor of nursing practice. Andreoni testified that defendant Anderson, ARNP, failed to

20

diagnose Bowens' necrotizing fasciitis and testified that Anderson's negligence caused the spread of infection. Anderson moved to strike Andreoni's testimony, arguing that the medical issues were beyond the scope of her training and expertise.

The trial court ruled on Anderson's motion as follows:

"1.     The Court finds that in the last sentence on page 3 of Colleen Andreoni's report, Colleen Andreoni expresses a causation opinion.

"2.     The Court finds Nurse Andreoni is not qualified to give any causation opinions in this case.

"3.     The Court finds this case involves complex medical processes which are beyond the common knowledge of the average juror and Nurse Andreoni's qualifications."

The last sentence on page three of Andreoni's report reads as follows:  "These deviations from the standard of care resulted in the spread of infection and delayed definitive treatment for Mr. Bowens' Fournier's gangrene resulting in prolonged pain, hospitalization, and recovery process."

For the present purpose only, we will assume Bowens has shown that the trial court erred in striking Andreoni's causation testimony. What effect did this error have on the outcome in this case? Andreoni's report and testimony suffered from the same deficiency as Dr. Fairbanks' report and testimony. Neither expert can quantify the amount of tissue loss Bowens suffered because of the delay in treating him.

For example, Andreoni testified that Anderson deviated from the standard of care in several ways. But in all her criticisms, Andreoni could not say to a reasonable degree of medical probability to what extent did Anderson's actions caused injury or harm to Bowens. Further, Andreoni's report did not have any opinions on how the infection spread. Andreoni was not aware of any surgeries Bowens had because of the alleged negligence. She had no opinion on how any alleged delay in diagnosis affected Bowens'

21

treatment or his outcome. And she did not think that surgical debridement could have been avoided. Thus, an earlier diagnosis would have meant that a surgical debridement would have occurred earlier. But Andreoni is unable to opine how much tissue loss Bowens would have suffered had the surgical debridement been performed on January 18, 2016.

So even assuming the trial court erred in striking Andreoni's testimony, this error was harmless because Bowens has failed to create a triable issue of fact on causation. None of Andreoni's statements would have brought Bowens closer to establishing causation—that the harm or injury would not have occurred *but for* Anderson's conduct. Thus, the trial court properly granted summary judgment in favor of Anderson.

*Did the trial court err in denying the motion to reconsider?*

In his motion to reconsider, Bowens presented no new information or grounds or legal authority on which to base an amended decision. Bowens simply restates the evidence that the trial court cited in its summary judgment but insists that it establishes causation. But the evidence only shows that delay in treatment may have caused an amount of tissue loss which is undetermined, if not indeterminable. If the nonmoving party does not produce evidence to establish an essential element of his or her claim, then the movant is entitled to summary judgment as a matter of law. *Dozier v. Dozier*, 252 Kan. 1035, 1041, 850 P.2d 789 (1993); see *Waste Connections of Kansas, Inc. v. Ritchie Corp.*, 296 Kan. 943, 962, 298 P.3d 250 (2013). Here, the trial court correctly granted summary judgment for failure to establish causation. Therefore, the trial court correctly denied Bowens' motion to reconsider.

For the preceding reasons, we affirm.

Affirmed.